## HUGH P. FARRELLY v. GEORGE E. COLE, *as Auditor of the State of Kansas.*

### No. 11379.

1. SPECIAL SESSION OF LEGISLATURE—*Action of the Governor Upheld*. The constitution of this state confers the supreme executive power upon the governor, and provides that he may, on extraordinary occasions, convene the legislature by proclamation. Such proclamation was issued, calling the members of the legislature together in extra session nineteen days before the time fixed by law for a meeting of the regular session. The proclamation did not expressly state that an extraordinary occasion had arisen, but it referred to the power vested in the governor by the constitution to make such call. This was followed by a message to the members convened, suggesting that legislation was demanded by the people respecting freight-rates to be charged by railroad companies. *Held*, that an extraordinary occasion was presented within the meaning of the constitution.

2. ——— *Extraordinary Occasion to be Determined by Governor Alone*. The question of the existence of an extraordinary occasion of sufficient gravity to justify a call for an extra session of the legislature is to be determined by the governor alone, in the exercise of his discretion as a sworn officer, and this discretion is not subject to challenge or review by the courts.

3. REPRESENTATIVES — *Apportionment Act of 1897 Construed*. Chapter 171, Laws of 1897, apportioning the state into representative districts, which went into effect on June 1, 1898, and repealed all acts in conflict with it, did not terminate the existence of the house of representatives of 1897, nor shorten the term of office of its members. A member of the legislature, unlike a county or township officer, has no official functions to perform within the district or territory from which he is elected. The division of the state into legislative districts is only a provision for future elections, and is not designed to affect the title to office or tenure of the members making the apportionment.

4. ———— *Commencement of Term of Office.* The constitution
fixes the term of office of members of the legislature for two years,
but does not expressly provide when their terms shall begin. In
the absence of such a provision it is competent for the legislature
to fix the commencement of the term. This has been done by
statute, which provides that the regular term of office for mem-
bers of the senate and house of representatives shall commence
on the second Tuesday of January next succeeding their election.

Original proceedings in mandamus. Opinion filed
March 11, 1899. Writ granted.

STATEMENT.

On February 2, 1899, the plaintiff, Hugh P. Far-
relly, filed in this court his petition and affidavit pray-
ing for an alternative writ of mandamus against the
defendant George E. Cole, auditor, alleging that at
the regular general election in November, 1896, plain-
tiff was duly elected state senator for the thirteenth
senatorial district of the state of Kansas, and duly
qualified as such; that as such state senator he at-
tended and performed the duties of his office at a legal
session of the legislature of the state of Kansas com-
mencing on the 21st day of December, 1898, and con-
cluding on the 9th day of January, 1899, and that, as
said state senator, he performed the duties of his office
in the said session of the legislature from the 31st day
of December, 1898, to the 7th day of January, 1899,
inclusive, and by reason of said services became en-
titled to compensation payable out of the treasury of
the state of Kansas in the sum of twenty-four dollars;
that on the 7th day of January, 1899, he received from
the secretary of the senate of the state of Kansas a
voucher for the said sum of twenty-four dollars due
him, which voucher was duly attested according to
law by the secretary of the senate; that afterwards,
on the 10th day of January, 1899, he presented the
said voucher, duly sworn to and attested, to George

E. Cole, auditor of the state of Kansas, and demanded that he draw his warrant upon the treasurer of the state to the amount of said voucher, payable to the plaintiff, and that said George E. Cole refused and still refuses to comply with said demand.

An alternative writ was issued conformable to the prayer of said petition; and thereafter, and on February 8, 1899, the defendant filed his answer and return thereto, setting forth his reasons for refusing to comply with the commands of said writ, in substance as follows:

The only attempted appropriation by which it is claimed that moneys mentioned in said writ could be withdrawn from the treasury of the state of Kansas, and the only authority under which it is claimed that the defendant should audit and allow the claim of the plaintiff, was conditioned upon the provisions of two certain pretended acts of the legislature claimed to have been passed at a pretended session of said legislature held at Topeka, Kan., commencing on the 21st day of December, 1898, the same being house bill No. 72, entitled "An act making an appropriation for the legislative department and general expenses incident to the special session of 1898," and house bill No. 90, entitled "An act making appropriation for the legislative department and general expenses incident to the special session of 1898 and 1899." Each of said pretended acts of said pretended legislature was null and void and of no force and effect whatever, and constituted no authority in law or otherwise by which the defendant could proceed to audit and allow the said claim or any part thereof for the following reasons:

On the 15th day of December, 1898, the Hon. John W. Leedy, as governor of the state of Kansas, issued his proclamation in the words and figures as follows, to wit:

"PROCLAMATION.

EXECUTIVE DEPARTMENT,
TOPEKA, KAN., December 15, 1898.
"WHEREAS, Assurances have reached me to the effect that, if the legislature shall be convened, suitable legislation for the regulation of railroad charges can be enacted, and deeming such matter of suf-

ficient importance to justify the convening of the legislature in special session:

"Now, THEREFORE, I, J. W. Leedy, governor of the state of Kansas, by virtue of the authority vested in me by the constitution of the state, do hereby convene the legislature of the state of Kansas to meet at the capitol of the state at the hour of four o'clock P. M. on the 21st day of December, 1898.

"In TESTIMONY WHEREOF, I have hereunto subscribed my name and caused to be affixed the great seal of the state of Kansas. Done at the city of Topeka, on the day and year first above written.

                                      J. W. LEEDY, Governor.
"Attest:  W. E. BUSH, Secretary of State."

No material changes had been made in the charges of railroad companies doing business within the state of Kansas for the transportation of persons or property within two years prior to the issuing of said proclamation, and none was threatened or impending at the time said proclamation was issued, and no unusual or material change had taken place affecting the nature of such traffic and transportation with regard to the reasonableness or unreasonableness of the prices charged therefor by said corporations, nor were any such changes threatened at the time said proclamation was issued. No extraordinary occasion existed on or about the 15th day of December, 1898, or the 21st day of December, 1898, authorizing the governor of the state of Kansas to convene the legislature of said state in special session, and no sufficient reason or excuse existed for the issuing of the proclamation hereinbefore set forth and for the convening of the legislature of said state in special session.

On the 21st day of December, 1898, in pursuance of the proclamation above set forth and without any other warrant or authority of law or otherwise, and without any reason or excuse for so doing, the members of the house of representatives elected at the general election held in 1896, with the exception of Hon. I. E. Lambert, of the forty-seventh representative district, Hon. Frank T. Patton, of the seventy-fourth representative district, Hon. John Heckman, of the one hundred and fifth representative district, Hon. Charles E. Lobdell, of the one hundred and fifteenth representative district, and Hon. C. A. Maxwell, of the one hundred and twentieth representative district, met in a pretended special session at the city of Topeka, Shaw-

nee county, Kansas; and in lieu of the parties above mentioned there were present, attending and taking part in said pretended special session, Hon. Chas. Harris, claiming to represent said forty-seventh representative district, Hon. W. C. Millar, claiming to represent said seventy-fourth representative district, Hon. James M. Sutcliffe, claiming to represent said one hundred and fifth representative district, Hon. S. L. Filson, claiming to represent said one hundred and fifteenth representative district, and Hon. Frank Byers, claiming to represent said one hundred and twentieth representative district; and at the same time the members of the state senate of the state of Kansas also met at the state-house in the city of Topeka, Shawnee county, Kansas, in pursuance of said proclamation, pretending to convene as a special session of the senate of the state of Kansas.

All the members of said house of representatives so convened at Topeka on the 21st day of December, 1898, with the exception of said Chas. Harris, W. C. Millar, James M. Sutcliffe, S. L. Filson, and Frank Byers, were chosen at the general election of 1896; and all the members of said house except those last above mentioned, and except John Seaton, J. M. Goodno, Elmer Loomis, A. L. Brooke, E. D. McKeever, H. A. Smith, R. B. Moore, Geo. T. Polson, Ed. Jaquins, F. P. Gillespie, E. R. Burkholder, S. S. Longley, Lot Ravenscraft, Alfred Lawson, Josiah Crosby, and H. F. Giessler, who had at the general election held in November, 1898, been elected members of the house of representatives of the state of Kansas from the representative districts in which they were then respectively residing, had no title or claim to their respective offices as members of the house of representatives of the state of Kansas, save and except that conferred upon them by, through and under the said election of November, 1896, and the proceedings had in pursuance thereof.

The answer and return then sets out the names of the members of said pretended house of representatives and the numbers of the respective districts from

which they were elected, being the districts created by chapter 4, Laws of 1891.   It also sets out the names of the members of the house of representatives chosen at the general election held in November, 1898, with the numbers of the respective representative districts from which they were chosen, being the districts mentioned in the apportionment act of 1897.  (Laws 1897, ch. 171.)   It also alleges that, on the final passage of said pretended house bill No. 72 in said pretended house of representatives, eighty-six persons, naming them, pretending to be members thereof, voted for said pretended bill ; and that on the final passage of said pretended house bill No. 90 in said pretended house of representatives seventy-three persons, naming them, pretending to be members thereof, and pretending that said legislature was in legal session, voted for said pretended house bill.

The answer and return specially denies that any act of the legislature of the state of Kansas directed or authorized the auditor of state to draw his warrant for the sum mentioned in favor of said plaintiff, on account of or for the services or claim mentioned in said alternative writ.

The matter was presented to this court upon a motion made by the plaintiff for the issuance of a peremptory writ of mandamus, notwithstanding the answer and return of the auditor of state.   The said motion was in legal effect a demurrer to the answer and return upon the ground that it did not state facts sufficient to constitute a defense to the petition and demand of the plaintiff.

*A. M. Harvey, Hungate & Thompson,* and *G. C. Clemens,* for the plaintiff.

*A. A. Godard,* attorney-general, and *D. R. Hite,* for the defendant.

The opinion of the court was delivered by

SMITH, J. : The questions involved are : (1) Did an extraordinary occasion exist, within the meaning of the constitutional provision providing for the call of an extra session of the legislature, on December 15, 1898, when the proclamation was issued? (2) Were the members of the house of representatives elected at the general election in November, 1896, who assembled in obedience to the proclamation of the governor, entitled to act as members of said house and to vote upon the final passage of said appropriation bills?

Section 3, article 1, of the constitution, is as follows : " The supreme executive power of the state shall be vested in a governor, who shall see that the laws are faithfully executed." Section 5, article 1, reads : " He may, on extraordinary occasions, convene the legislature by proclamation, and shall, at the commencement of every session, communicate in writing such information as he may possess in reference to the condition of the state, and recommend such measures as he may deem expedient." The sole power is thus deposited in the governor to convene the legislature on extraordinary occasions, and it has been uniformly held that he cannot be compelled by mandamus to act should he refuse for any reason to exercise the power, nor be restrained by injunction in an attempt to exercise it.

On the argument it was conceded by the defendant's counsel that in the trial of the issues raised by the return the court could only consider such matters as, under the law, it can take notice of judicially. While the return makes certain allegations which it would require evidence to establish, the consideration of such matters was, under the admission of counsel

Farrelly v. Cole.

above stated, eliminated from the case.   These aver-
ments are as follows :

" 2.  That no material changes had been made in the
charges of railroad companies doing business within
the state of Kansas for the transportation of persons
or property within two years prior to the issuing of
said proclamation, and none was threatened or im-
pending at the time such proclamation was issued,
and no unusual or material change had taken place
affecting the nature of such traffic and transportation
with regard to the reasonableness or unreasonableness
of the prices charged therefor by said corporations,
nor were any such changes threatened at the time said
proclamation was issued."

The admission made is significant.   It goes to the
proposition that a trial of the question of the existence
of an extraordinary occasion cannot be had on evidence
commonly resorted to in ordinary cases.   We are not
convinced, notwithstanding the admission of counsel,
that the court ought thus to be restricted in the con-
sideration of the case if jurisdiction be retained ; and
the admission that outside of its judicial knowledge
the court could not properly, by the hearing of evi-
dence, gain further information of the matters in is-
sue, tends to fortify the position of the plaintiff that
no investigation of the constitutional question in-
volved ought to be had in any court on evidence of
any sort.

It is not contended that the proclamation of the
governor need contain a statement that the occasion
was extraordinary.   It does state : "I, . . . by
virtue of the authority vested in me by the constitu-
tion of the state, do hereby convene the legislature of
the state of Kansas," etc.   As the governor is wholly
wanting in power to convene the legislature except on
extraordinary occasions, the language above quoted

made it certain by its reference to the constitution that an extraordinary occasion was meant. We are led to believe that if the governor had stopped with the proclamation there would have been no contention over the legality of the call and the subsequent acts of the legislature when assembled; but it is said that the message sent by him to the senate and house of representatives on December 21 conclusively shows that no extraordinary occasion existed. The message reads:

"*To the Senate and House of Representatives:* Although the present executive and a majority of each house of the present legislature were elected under a pledge to the people to enact a maximum-rate law, when the time arrived for fulfilling that pledge the menace of a judicial decision by the highest tribunal in the land, which would make legislative regulation of railroad charges practically impossible, caused many to doubt the wisdom of attempting the promised legislation; and such difference of opinion prevailed that the executive felt called upon to withhold his approval from the compromise measure finally passed. There was then pending undetermined in the supreme court of the United States a case which involved the question whether, as to railroad legislation, the legislatures of theoretically sovereign states should be reduced to the level of city councils or school-district boards, upon the reasonableness, as well as the authority, of whose acts courts may sit in judgment.

"The decision of that case, announced soon after the adjournment of the legislature, fully justified the fears and anticipations of those who deemed it futile to pass a maximum rate bill; for it rendered such an enactment a mere proposal of legislation — not a law — which must be submitted to the federal court for approval or rejection. That decision declared that whether the rates of transportation prescribed by a legislature are reasonable is a judicial question, and that, first, a single federal judge, and finally five federal justices, may upon that question reverse and

Farrelly v. Cole

hold null the deliberate judgment of an entire legislature, with its numerous membership, acting under the same oath as the judges, and calmly deliberating for days in separate chambers; that the courts may sit in judgment, not merely upon the constitutional power of the legislature to legislate concerning the particular subject-matter, but upon the reasonableness of its acts — the power to act being conceded.

"At the same time the court declined, though urged, to lay down any definite rule by which, in advance of its judgment in each particular case, a legislature might be able to say whether suggested rates would be held reasonable or not; so that whether rates are reasonable can be determined only by a standard which must remain unknown to every human being but the justices of that court, save as they may vouchsafe to reveal it anew as each successive law comes before them to be destroyed. It follows that you can only suggest maximum rates; you cannot prescribe them. You can submit for approval a maximum-rate proposition; you cannot enact a maximum-rate law.

" However, while the people of Kansas have for years been demanding a maximum-rate law, the real essence of their demand has been the regulation of railroad charges; and, although we have been deprived of the power to redeem our pledge according to its very letter, it is still our duty to do what we can to redeem it according to its spirit; and that this may be done I have exercised the power given me by the constitution to convene you in special session."

Being permitted to resort only to our judicial knowledge (the proclamation being conceded to be sufficient in its recitals), the evidence of a lack of power in the governor to do what he did is confined to the message. On this we are called upon to decide whether it discloses such an ordinary and commonplace occasion for the call as to compel a conclusion that no emergency existed. The question is thus narrowed down to whether the statements in the message con-

vict the governor of a violation of the constitutional provision mentioned.

It must be remembered that what may seem extraordinary in the estimation of one man or official may be deemed commonplace and ordinary by another. Members of different political parties look at men and measures from different standpoints. One party "points with pride" to a line of political policy and legislation, while another in estimating the same conduct and policy "views it with alarm." The suggestions contained in the message, from our knowledge of the doctrines of the political party to which the governor belonged, were but the reiteration of a persistent demand by that party for legislation in respect to freight-rates. In its platforms it had before this made this question conspicuous and, when in control of both branches of the legislature, had passed a freight-rate bill, which was, however, vetoed by the governor.

Clear, palpable and unquestioned violation of the constitutional grant of power to the executive, admitting of no debate, must be apparent before the courts will be justified, if at all, in nullifying his acts. The fact that a majority or a large proportion of the people of the state may regard proposed legislation as useless, destructive of property rights or vicious will not stamp the subject-matter of such legislation, when demanded by the executive of the lawmaking power, as ordinary or frivolous, warranting the courts in saying that such request or demand by the governor is violative of the constitutional provision under discussion.

That clause of our constitution relating to extra sessions of the legislature was adopted from a very similar provision found in the constitution of the United

States, which reads : " . . . He [the president] may, on extraordinary occasions, convene both houses [of congress] or either of them." (U. S. Const., art. 2, § 3.) While the president may convene both houses of congress, or either of them, the governor can only call together the legislature, which includes both the senate and house of representatives. Commenting on this power of the president, the late Justice Miller, in his Lectures on the Constitution, page 170, says : "The principal exercise of this power has been in proclamations by which the president has called the senate together, at the close of a session of congress, for the purpose of considering appointments to office, and sometimes treaties."

The first call for a session of the senate was on March 1, 1791 ( 1 Mess. & Pap. of Pres. 587 ), as follows :

"*The President of the United States to the President of the Senate :* Certain matters touching the public good requiring that the senate shall be convened on Friday, the 4th instant, I have desired their attendance, as I do yours, by these presents, at the senate chamber in Philadelphia on that day, then and there to receive and deliberate on such communications as shall be made to you on my part. Go. WASHINGTON."

After this the senate was convened by President Washington on three occasions, March 4, 1793, June 8, 1795, and March 4, 1797. The last call (1 id. 212) reads :

"*To the Vice-president and Senators of the United States, respectively :* SIR — It appearing to me proper that the senate of the United States should be convened on Saturday, the 4th of March instant, you are desired to attend in the chamber of the senate on that day, at ten o'clock in the forenoon, to receive any communications which the president of the United States may then lay before you touching their interests. Go. WASHINGTON."

Under proclamations substantially like the above the United States senate was convened twice by John Adams, and once each by Jefferson, Madison, Monroe, John Quincy Adams, Jackson, Van Buren, Tyler, and Polk. The proclamations of Presidents Tyler and Polk commence : " Objects interesting to the United States requiring that the senate should be in session," etc. From the adoption of the constitution to the year 1851, a time when the most distinguished judges and lawyers adorned the bench and bar, there is no suggestion in any such proclamations of the existence of an emergency or extraordinary occasion. Commencing, however, with Fillmore, all the presidents have recited in their proclamations convening the senate the existence of an extraordinary occasion, and all of them have so proclaimed when calling together both houses of congress. ( Messages and Papers of the Presidents, vols. 1 to 9.)

If the proclamation of Governor Leedy was defective, it seems to have been much less so than those issued by the presidents for more than fifty years. As before stated, the most usual purpose for which the senate of the United States is convened is for the confirmation of the appointment of officers. The constitution provides : " He [the president] shall nominate, and by and with the advice of the senate shall appoint ambassadors, other public ministers and consuls, judges of the supreme court, and all other officers of the United States whose appointments are not herein otherwise provided for, and which shall be established by law." (U. S. Const., art. 2, § 2.) The president is devoid of power to convene the senate of the United States except upon an extraordinary occasion. If he is empowered under the constitution to call that dignified body together for the confirmation of several

appointees, it follows logically that he has no less authority to convene it for the confirmation of one. Take for example the case of a postmaster. The lowest salary attached to what is known as a presidential post-office is $1000 per year. Yet who, with the possible exception of the prospective postmaster himself, would consider that an extraordinary occasion had arisen should the president call the senate together for the sole purpose of confirming such an officer. Yet the legality of the act cannot be questioned; and, after confirmation, who would contend that there were any flaws in the title of the incumbent to the office? Again, the necessity for confirmation of federal officers can hardly be considered urgent, since the statutes of the United States confer authority on the president to make appointments during a recess of the senate, such appointments to be submitted to the senate at a subsequent session. (U. S. Rev. Stat. [1878], § 1769.)

If we were scrutinizing the conduct of a president in such matters, prior to 1851 we would find repeated calls to the senate for a meeting making no mention of an extraordinary occasion, with no message from the executive to that body following it more than a list of appointees which he desired to have confirmed. Yet all persons, constitutional lawyers, judges, and legislators, have acquiesced in the constitutional right of the president thus to convene the senate for the purpose named.

There being no doubt or question of the power of the president to convene the senate of the United States in extraordinary session to consider appointments made by him, by what process of differentiation is the authority withheld from the governor of Kansas, under the constitution, to convene both branches

24—60 KAN.

of the legislature (for he cannot convene the senate alone) in extraordinary session in order that the presence of the senate may be had to consider and confirm his appointments? If an extraordinary occasion is presented in the desire of the president to have his appointment of a thousand-dollar-a-year postmaster confirmed by the United States senate, the occasion cannot be said to be less extraordinary should the governor desire the appointment of a regent of the state university, or other officer of less consequence, to be confirmed by the senate of Kansas, and should call the legislature together for that purpose.

These illustrations show that the words "extraordinary occasion," employed in the two constitutions, have been construed by long-continued custom and practical usage not to be synonymous with overpowering and urgent necessity. The practice has prevailed, with few exceptions, in recent years for the retiring president, by proclamation, to convene the senate to meet on the 4th of March ensuing, for the sole purpose of acting on appointments to be made by the incoming executive. It might well be the subject of debate, when such a call was made by President Cleveland during the expiring days of his first term of office, convening the senate on March 4, 1889, whether he considered it of supreme importance that an extra session be held in order that his political friends and adherents might be expeditiously turned out of office and his enemies installed. Yet what court would have entertained a controversy, involving an attack on his constitutional power, to try the fact of the existence of an extraordinary occasion at that time? It will be noted that in such cases the president making the call does not further communicate with the senate by message or otherwise, and it is not supposable, when

he is succeeded by a political opponent, that he is advised in advance of the appointments to be made, which the senate is called upon to consider.

Thus we have seen that extra sessions of the senate of the United States have been and may be called and held for purposes common and ordinary, and for cause so slight and inconsequential as to be wholly at variance with the idea of extraordinary necessity, under the constitutional grant of power to which reference has been made. While the purpose of the framers of the fundamental law may have been that the executive authority now under discussion should be used only in the event of imperative necessity, yet departure from this intent was begun early in the nation's history, and, continuing until now, custom has become fixed law, engrafting itself upon the constitution, compelling the courts to recognize and respect it. Are we not then driven to the conclusion that whether a condition exists which is uncommon and out of the ordinary course of things is to be determined by the president or governor in the exercise of discretion which has been reposed in them by the people, and from which, when once exercised, there can be no appeal to the courts?

It would be an unseemly and unprecedented proceeding for this court, or any court, to entertain a controversy wherein, by proof obtained from witnesses sworn in the cause, it sought to ascertain judicially whether an extraordinary occasion existed of sufficient gravity to authorize the governor to convene the legislature in extra session. If jurisdiction be retained of such a cause, what is the rule as to the *quantum* of evidence necessary to establish that there was no emergency. This is a civil action. In such cases the party having the preponderance of evidence on his side must

prevail. The utter absurdity of such an inquiry, wherein a judgment either way is made to depend upon the slightest preponderance of the evidence, no doubt furnished the reason why the counsel for the defendant took the position that judicial knowledge alone could be employed, abandoning the second paragraph of the return above set out, the truth of its averments necessarily depending upon proof derived from the testimony of witnesses. Discretion is defined, when applied to public functionaries, to be "a power or right, conferred upon them by law, of acting officially in certain circumstances according to the dictates of their own judgment and conscience, uncontrolled by the judgment or conscience of others." (*Judges of the Oneida C. P. v. The People*, 18 Wend. 99.) It perverts and destroys the meaning of the word to hold that exercise of discretion may be reviewed or controlled by some other person or tribunal than the person on whom it is conferred. Ministerial duties resting on an executive officer have frequently been enforced by the courts. Ministerial acts do not flow from the exercise of discretion, but involve a simple, definite duty imposed by law. (*Martin, Governor, v. Ingham*, 38 Kan. 641, 17 Pac. 162.)

The case of *The State, ex rel., v. School Fund*, 4 Kan. 261, is cited as an authority that this court will review the discretionary acts of a coordinate branch of the state government, *i. e.*, the legislature. Sections 3 and 5, article 11, of the constitution read:

"SEC. 3. The legislature shall provide, at each regular session, for raising sufficient revenue to defray the current expenses of the state for two years.

"SEC. 5. For the purpose of defraying extraordinary expenses and making public improvements, the state may contract public debts."

In 1868 an act was passed by the legislature entitled: "An act providing for the issuance and sale of bonds of the state for the purpose of paying the officers and members of the state legislature and current expenses of the state." (Laws 1868, ch. 3.) Bonds were issued under this act. They were decided to be void as being issued in violation of said section 5 of the constitution above quoted. The control of discretion was not involved. Chief Justice Kingman says (*The State, ex rel., v. School Fund*, 4 Kan. 269): "There is no pretense in the law that the expenses were extraordinary in their character." The question decided was as to the character of the expense. This the legislature had before decided, both in the title and body of the act, and this court merely affirmed its decision. The court said: "The legislature has not even pretended to declare the expenses extraordinary in their character or in the circumstances attending them."

In *Martin, Governor, v. Ingham*, supra, Mr. Justice Valentine, in the opinion, says:

"No court ever attempts, by either injunction or mandamus, or by any other action or proceeding, to control legislative, judicial, executive or political discretion; and never indeed attempts to control any purely legislative, judicial or executive act of any kind, nor pure discretion of any kind, except when a superior court on appeal reviews a decision of an inferior court. . . . The only acts of public functionaries which the courts ever attempt to control by either injunction or mandamus are such acts only as are in their nature strictly ministerial; and a ministerial act is one which a public officer or agent is required to perform upon a given state of facts in a prescribed manner, in obedience to the mandate of legal authority, and without regard to his own judgment or opinion concerning the propriety or impropriety of the act to be performed."

Cases might be imagined, however, where the courts would be justified in declaring void the acts of a legislative body assembled at the call of a governor in extra session. For instance, if the declared object of the meeting appeared to be obviously irrelevant or utterly frivolous and trifling, showing a rampant and revolutionary purpose on the part of the executive to subvert his prescribed powers in defiance of all lawful restraint, convincing the meanest understanding that all constitutional limits of authority had been disregarded, thus bringing scandal upon the state, in such case it might well be held that judgment and discretion had fled, and that the act was done through a blind, unreasoning resort to what might be likened to physical force. Or if it should appear from the official declarations of the governor that he resented the limitations set by the constitution upon his authority, contending that no extraordinary occasion existed or emergency had arisen, or that he denied that any check whatever was imposed upon his power to act, and proclaimed that the special session was called to pass laws of a general nature, no particular legislation being mentioned, the declared object being merely to shorten the work of the regular session, and thus showing a deliberate and studied design to ignore the constitution, a legal inference would at once arise that he had not used any discretion whatever, for discretion necessarily implies the exercise of a certain degree of common sense. However, it could hardly be presumed that in either event mentioned the members of the legislature would give heed to a call so grossly violative of the constitution, which each of them is required on oath to support and defend. This being a republican form of government, the people are on guard. They have made a constitution for the guidance of their

servants in the discharge of official duties.   If a governor transgress, by abuse of discretion or otherwise, they have made provision for his impeachment and deposition.   Should he escape this punishment, the sovereign power resides with' the people to condemn his acts at the polls by removing him from a place of power after a brief term of office.

This court has repeatedly decided that it cannot review legislative discretion.   In the early case of *State of Kansas, ex rel. Johnson, v. Hitchcock*, 1 Kan. 178, section 17 of article 2 of the constitution was under consideration.   It provides : " In . all cases where a general law can be made · applicable, no special law shall be enacted."   It was held that the language used leaves discretion to the · legislature, recognizing the necessity of some special legislation, and that it seeks only to limit, not to prohibit, it.   The legislature must determine whether its purpose can or cannot be expediently accomplished by a general law. (*Knowles v. Board of Education*, 33 Kan. 692, 7 Pac. 561.)

The adjudicated cases are few in which the precise question before us has been considered.   However, there are authorities directly in point.   In, *Whiteman's Executors v. Railroad*, 2 Harrington (Del.) 514, it is said :

"Another objection to the validity of this supplement is founded upon the assumption that the general assembly which passed it was not constitutionally convened, and that consequently not only this but all its acts at that session are absolutely void.   In the constitution of this state (article 3, section 12) the governor is authorized to convene the general assembly on extraordinary occasions.   This is a power the exercise of which the framers of the constitution have seen fit to entrust to the chief executive officer of the

state alone. As they have not defined what shall be deemed an extraordinary occasion for this purpose, nor referred the settlement of the question to any other department or branch of the government, the governor must necessarily be himself the judge, or he cannot exercise the power. He may err, but this court has no jurisdiction to review his decision or to correct his error. If he act corruptly he is liable to impeachment; but the doctrine that a mistake, or even corruption, on the part of the governor in convening the general assembly invalidates the acts of that body would be productive of incalculable mischief.''

In Colorado the legislature is authorized to submit to the judges of the supreme court important questions involving public interests. The judges are then required to decide the same, although no case is pending before the court. In *Veto Power*, 9 Colo. 642, 21 Pac. 477, the supreme court was asked by the legislature to give an opinion whether the decision of the governor in convening the legislature in special session was conclusive or not. The court said : '' Whether or not an occasion exists of such extraordinary character as demands a convention of the general assembly in special session, under the provisions of section 9, article 4, of the constitution, is a matter resting entirely in the judgment of the executive.'' Again this question was before the supreme court of Colorado, and their opinion, reported in *In re Governor's Proclamation*, 19 Colo. 333, 35 Pac. 531, contains the following language : '' The governor is thus invested with extraordinary powers. He alone is to determine when there is an extraordinary occasion for convening the legislature.''

In *People v. Rice*, 65 Hun, 20 N. Y. Supp. 296, the supreme court of New York, in deciding this question, on page 245, uses the following language : '' The

governor by his proclamation assumed to convene the legislature in extra session under the provisions of section 4, article 4, of the constitution. This article gave the governor power to convene the legislature in extraordinary session ; and from the very nature of this provision he must be the judge as to what constitutes the extraordinary occasion.''

In Rhode Island there exists the same provision which is found in Colorado, authorizing the house of representatives to propound questions to the supreme court for an opinion. In 1893 the house of representatives propounded to the supreme court of Rhode Island certain questions touching the duties and powers of the governor. The supreme court rendered its opinion as found in *In re the Legislative Adjournment*, 18 R. I. 826, 27 Atl. 327. Among other things the court said :

''The powers vested in the executive department are to be exercised by the governor under his oath of office, and under the express constitutional injunction that he ' shall take care that the laws be faithfully executed ' ; and he is responsible to the people alone for the manner in which he discharges the duties of his high office. If he violates the constitution or the laws which he is sworn to support he may be impeached and removed from office, and may also be indicted and punished like any other person. But for the exercise of his powers and prerogatives as governor neither the legislative nor the judicial department of the government has any power to call him to account, nor can they or either of them review his action in connection therewith. In short, it cannot be questioned that the governor is supreme and independent in the executive department, as is the legislature in the legislative and the court in the judicial department of the government. Moreover, this is a case in which the executive department of the state government has the power and duty to finally pass

upon a question of constitutional construction. . . . The power of the executive which we are considering is a political power, 'in the exercise of which,' in the language of Chief Justice Marshall, in *Marbury v. Madison*, 1 Cranch, 137, 'he is to use his own discretion and is accountable only to his country in his political character and to his own conscience, and whatever opinion may be entertained of the manner in which the executive discretion may be used, still there exists no power to control that discretion.' The subject is political."

The supreme court of Wisconsin, in *State v. Farwell*, 3 Pinney, 439, in speaking of this question, says :

"But if the right is contingent, and is made to depend upon the discretion of the executive, in such case, until that discretion be exercised no right can vest ; and if, in the exercise of that discretion, the governor deny the right, then all claim of right is gone. His determination is final upon the question of right, as much as is that of a court of competent jurisdiction."

In *United States v. Arredondo*, 6 Pet. 729, the supreme court of the United States uses the following language :

"It is a universal principle, that where power or jurisdiction is delegated to any public officer or tribunal over a subject-matter, and its exercise is confined to his or their discretion, the acts so done are binding and valid as to the subject-matter ; and individual rights will not be disturbed collaterally for anything done in the exercise of that discretion within the authority and power conferred. The only questions which can arise between an individual claiming a right under the acts done and the public or any person denying its validity are power in the officer and fraud in the party. All other questions are settled by the decision made or the act done by the tribunal or officer, whether executive, legislative, or judicial."

The late Judge Cooley, regarded everywhere as one of the greatest of our constitutional lawyers, and the

highest authority on constitutional questions, at page 41 of his Constitutional Limitations, says:

"Sometimes the case will be such that the decision when made must, from the nature of things, be conclusive and subject to no appeal or review, however erroneous it may be in the opinion of other departments or other officers. But in other cases the same question may be required to be passed upon again before the duty is completely performed. The first of these classes is where, by the constitution, a particular question is plainly addressed to the discretion or judgment of some one department or officer, so that the interference of any other department or officer with a view to the substitution of its own discretion or judgment in the place of that to which the constitution has confided the decision would be impertinent and intrusive. Under every constitution cases of this description are to be met with; and, though it will sometimes be found difficult to classify them, there can be no doubt, when the case is properly determined to be one of this character, that the rule must prevail which makes the decision final. We will suppose, again, that the constitution empowers the executive to convene the legislature on extraordinary occasions, and does not in terms authorize the intervention of any one else in determining what is and what is not such an occasion in the constitutional sense; it is obvious that the question is addressed exclusively to the executive judgment, and neither the legislative nor the judicial department can interfere to compel action if the executive decides against it, or to enjoin action if, in his opinion, the proper occasion has arisen. . . .

"But there are cases in which the question of construction is equally addressed to two or more departments of the government, and it then becomes important to know whether the decision by one is binding upon the others, or whether each is to act upon its own judgment. Let us suppose once more that the governor, being empowered by the constitution to convene the legislature upon extraordinary occasions, has regarded a particular event as being

such an occasion, and has issued his proclamation calling them together with a view to the enactment of some particular legislation which the event seems to call for, and which he specifies in his proclamation. Now, the legislature are to enact the laws upon their own view of necessity and expediency; and they will refuse to pass the desired statute if they regard it as unwise or unimportant. But in so doing they indirectly review the governor's decision, especially if, in refusing to pass the law, they do so on the ground that the specific event was not one calling for action on their part. In such case, it is clear that while the decision of the governor is final, so far as to require the legislature to meet, it is not final in any sense that would bind the legislative department to accept and act upon it when they enter upon the performance of their duty in the making of laws."

As stated by Judge Cooley, the legislature in this state, when convened, could wholly ignore the reasons given by the governor calling it together, and disregard entirely all suggestions made by him touching the necessity of proposed legislation. Not being restricted by the constitution to the consideration of matters within the limits of the governor's proclamation, it might proceed to enact laws having no relevancy to the object for which it was convened. The fact that the railroad law creating a court of visitation does not take effect until March 15 cannot affect the question of the necessity of convening the legislature in December for the enacting of laws affecting freight-rates. The acts of the executive cannot be judged by the action of the legislature. If no railroad legislation had been enacted, that fact would have been no proof that the governor's proclamation and message were unauthorized.

We come now to the consideration of the second question in the case. Did the house of representa-

tives which united with the senate on December 21, 1898, in special session of the legislature, constitute a legal organization? The contention is that chapter 171 of the Laws of 1897, apportioning the state into representative districts, which by its terms went into effect on June 1, 1898, and repealed all acts in conflict with it, terminated the existence of the house of 1897, the members of which it was supposed had been elected for a term of two years; and there is the further claim that if any house existed when the special session convened it was the one elected in November, 1898.

This proposition has at least the merit of novelty. It has been the generally accepted opinion that the terms of members of the legislature began on the second Tuesday of January; that the representatives held their offices for two years and senators for four years from that time, and that their terms, as fixed by the constitution, were not and could not be shortened by the passage of an apportionment act. This view of the constitution and statutes has been acquiesced in by the executive, legislative and judicial departments of the state government since its organization, and such an interpretation, adopted, as it has been, by the people for about a third of a century, is entitled to much force. In our opinion, the passing of an apportionment act does not shorten or affect the term of office of members of the legislature then serving, nor was it intended that it should have such effect.

The constitution plainly fixes the term of a representative at two years, but does not expressly provide when the legislative term shall begin. In the absence of such provision it is competent for the legislature to fix the commencement of the term. That

the legislature possesses this power was determined in an early day in *State of Kansas, ex rel. Crawford, v. Robinson and others,* 1 Kan. 17 ; and at the same time the court rejected the theory that the terms began when the members were elected or declared to be so. Since that time, and in accordance with that decision, the legislature fixed the commencement of the term by providing as follows : ''The regular term of office for members of the senate and house of representatives shall commence on the second Tuesday of January next succeeding their election.'' (Gen. Stat. 1889, ¶ 2721; Gen. Stat. 1897, ch. 52, § 8.)

This statute is in harmony with the constitutional provisions on the same subject, which manifestly contemplate that the term shall begin at that time. In section 25, of article 2, of the constitution, it is provided that the regular sessions of the legislature shall commence on the second Tuesday of January, and in section 6 of article 1, where provision is made for adjournment in case of a disagreement between the two houses, the governor is expressly authorized to adjourn the legislature to such a time as he may think proper, '' not beyond its regular meeting.'' The clear implication of this provision is that each house of representatives shall continue to exist until the beginning of the next regular session. Whatever force may be given to this implication, it is clear that these provisions, together with the act of 1868, fix the second Tuesday in January next after the election as the time for the beginning of legislative terms, and each representative elected is entitled to hold his office for two years. The law fixing the commencement of the term was passed in 1868, and since then the terms of representatives and senators have been extended in length and the sessions of the legislature have been made bien-

nial by the amendment of 1877.   This amendment does not in terms repeal the act, nor does it contain anything that would ·operate as a repeal by implication.   The act is prospective in character, and is just as appropriate and applicable under the amendment as it was under the original provision of the constitution.   The act was not repealed by the amendment, but is still effective in fixing the commencement of the terms of members of the legislature. (*Prouty v. Stover*, *Lieutenant-governor*, 11 Kan. 235.)

The legislature· may provide when the terms of members shall begin, but it cannot abridge or extend the terms fixed by the constitution.   As the second Tuesday in January, 1897, must be held to be the commencement of the term of members of the house in question, and as the constitution fixes the duration of the term at two years, is it not a violent assumption that the legislature intended, or had authority, to abridge the terms of the members to about seventeen months, thus completely abolishing one branch of the legislature?   Did it, by apportioning the state and providing for the election of the succeeding legislature, constitutionally destroy the house of representatives and practically legislate itself out of existence? Nothing in the language of the act indicates such a purpose, if, indeed, it had the power to accomplish it.

It is contended, however, that the repeal of the former apportionment act in effect destroyed the old representative districts and necessarily abolished the offices of the representatives elected therefrom.   The situation is likened to the abolition of a county or township, in which case it has been held that the abolition of the municipal organization has the effect of ousting the officers of such organization from office.   This is decided on the theory that the jurisdiction of the officers

is confined to the municipality for which they were elected, and that when the municipality within which the official functions of the officers are to be performed is abolished, the officers themselves go with it. We cannot see the analogy between the two cases. In that case the officers cannot perform their official functions because the organization in which they are to be performed no longer exists. In the case of a member of the legislature, although he is chosen from and must reside within his district, he performs no official function therein. Instead of acting individually within his district, he becomes a member of an organization which acts only in its organic capacity, and at the capital of the state. He is in a certain sense an officer of the state; and, with others, constitutes a department of the state government. The district from which he is elected is not a municipal or *quasi*-municipal corporation, and it never acts, or is dealt with, as a political entity. Districts are provided to create a system by which the members will be close to the people whom they represent, and from which members are to be elected. In creating districts for this purpose, the legislature fixes the boundary lines and designates them by numbers, but that is the extent of the organization and the only reason for their existence. The voters within the limits of a district are an electoral body who choose one of their number to represent them in the legislature, and no other action is ever taken by them as a result of such organization. The member is therefore not an officer of the district as the probate judge is an officer of the county, or a justice of the peace an officer of the township.

The matter of apportionment is only a provision for future elections, and is not designed to affect the title

to office or the tenure of the members making the apportionment. Only brief periods intervene between apportionments, if constitutional requirements be observed, and they must not only be made, but they must go into effect, long enough before the election to give the electors opportunity to comply with the ballot and election laws. This necessarily requires considerable time, and certainly it was not contemplated that during this long period the office of representative should be abolished, or that the legislature could not, however great the emergency, be convened. The apportionment act provided means for electing the representatives whose terms began on the second Tuesday in January, 1899, and had no effect whatever except as a provision affecting future elections. The territory constituting the old districts remained, and the constitutional terms of the representatives were not shortened by the shifting of the lines and the change of the numbers ; nor was any one legislated out of office by the passage of the act. An examination of the apportionment act shows that but little change was made in the districts. In most cases a single county constituted a legislative district; and where a county was divided into two or more districts, the territory composing each district is largely the same as was included in it under the former act, but designated by a different number. The exterior limits being substantially as they were before, and some, if not all, of the territory of the old districts constituting a part of the new, leaves but little ground for the assertion that the members were left without territory or districts. Our view, however, is that the provisions made for future elections were not intended and did not affect the tenure of office of the members making them, and that the members elected in November,

25—60 KAN.

1896, were entitled to hold their offices for the constitutional period of two years, and up to the second Tuesday in January, 1899.

It is significant that the representatives elected in November, 1898, did not respond to the call of the governor or assume that they were entitled to their offices before the time for the convening of the regular session. The members elected in 1896 only claimed a place in the house of representatives at the special session. No person disputed their rights, claimed their seats, or molested them in the discharge of their duties. The house so organized was recognized by the other branches of the lawmaking power, and the validity of the organization was not challenged until the present proceeding was begun.

It follows, then, that the house of representatives was a legal organization, and that the preliminary requirements of the constitution leading up to its meeting with the senate as a legislature in special session were observed.

For the reasons herein expressed, the motion of the plaintiff for a peremptory writ of mandamus, notwithstanding the answer and return, will be sustained and the writ issued.