No. 43,289

J. P. HARRIS, et al., *Appellees,* v. PAUL R. SHANAHAN, as Secretary of State, et al., *Appellants.*

(387 P. 2d 771)

Opinion filed December 5, 1963.

A. K. Stavely and Park McGee, Assistant Attorneys General, of Topeka, argued the cause, and William M. Ferguson, Attorney General, and Robert E. Hoffman and Richard H. Seaton, Assistant Attorneys General, of Topeka, were with them on the briefs for the appellants.

William Y. Chalfant, of Hutchinson, argued the cause, and H. R. Branine and C. E. Chalfant, of Hutchinson, were with him on the briefs for the appellees.

The opinion of the court was delivered by

FATZER, J.: This action attacks the apportionment of the senate and house of representatives of the Kansas legislature. The appeal is from the order and judgment of the district court holding G. S. 1949, 4-102, relating to the seats in the senate, and G. S. 1961 Supp., 4-103, relating to the seats in multi-district counties of the house, to be unconstitutional and void; enjoining the secretary of state and various county election officials from performing any acts relating to the election of senators and representatives under those statutes, and ordering that the primary and general elections for seats in the senate be held on a state-wide basis and on a county-wide basis for the seats in the house of representatives in all multi-district counties.

When originally filed on November 1, 1961, the petition contained three causes of action. The first cause of action attacked the apportionment of senatorial districts. The second cause of action alleged that Article 2, Section 2, and Article 10, Section 1, apportioning the state into 105 representative districts on a geographical basis, that is, one to each county regardless of population, leaving only 20 seats to be apportioned on the basis of population, constituted a discriminatory apportionment of the house of representatives and denied the right of equal participation in the processes of state government and denied a vote and representation equal or substantially equal to that of citizens and qualified electors residing in counties and house districts with a disportionately smaller population and constituted an abridgement of the constitutional rights of plaintiffs and all other citizens and qualified electors similarly situated in violation of Sections 1 and 2 of the Bill of Rights of the Kansas Constitution, Article 4, Section 4 of the Constitution of the United States, and the Fourteenth Amendment thereto which prohibits a state from depriving any person of life, liberty or property without due process of law or denying to any person within its jurisdiction equal protection of the laws. The third cause of action, alternative if no relief be granted on the second cause of action, related to multi-district seats in the house of representatives from counties having more than one legislative district. Subsequently and before trial, plaintiffs dismissed their second cause of action and trial was had on the first and third causes of action only.

The allegations of the first and third causes of action were substantially similar except that the first cause alleged no apportionment of the senate had been made since 1947. Both causes of action alleged in substance that the apportionment statutes (G. S. 1949, 4-102, and G. S. 1961 Supp., 4-103) were unconstitutional and void in that they were not based upon the census of each preceding year and were not made in accordance with Article 10, Section 2 of the Constitution of Kansas; that they were grossly discriminatory against the right of equal representation of voters and taxpayers of the metropolitan or urban areas of the state thus arbitrarily depriving them of liberty and property without due process of law, and denying to them the equal protection of the laws, and their rights and privileges as citizens were thereby abridged in violation of the Fourteenth Amendment to the Constitution of the United States and of Article 2, Sections 2 and 29, of Article 4, Section 2, and Article 5, Section 1, of the Constitution of Kansas; and of the Civil Rights Act (28 U. S. C. § 1343; 42 U. S. C. §§ 1983, 1988). Also, that plaintiffs were thereby deprived of a republican form of government as guaranteed by Article 4, Section 4, of the Constitution of the United States. The prayer was that the defendants be enjoined from performing any acts relating to election of senator and representatives under the statutes, and for an order requiring that the primary and general elections for seats in the senate be held on a state-wide basis and on a county-wide basis for the seats in the house of representatives in all multi-district counties.

Issues were joined by the defendants' answer and plaintiffs' reply and trial was by the court upon a stipulation of facts agreed to by the parties. The stipulation contained the population of the 40 senate districts for the years 1946 and 1961, respectively; the population of the thirteen counties containing more than one representative district, and the population of the representative districts in those thirteen counties, based upon the official state census for the preceding years. The assertions and mathematical conclusions contained in plaintiffs' petition concerning the disparity of vote and representation between the various senate districts and between representative districts located in multi-district counties also were stipulated as true. The plaintiffs offered the stipulation in evidence and rested, and the defendants offered no evidence. All matters contained in the stipulation were substantially found as facts by the court.

On July 26, 1962, the court rendered judgment in favor of the plaintiffs as heretofore related, and the defendants timely perfected this appeal. Upon the defendants' application, this court entered its order on July 30, 1962, staying the judgment during the pendency of the appeal.

The case was heard on its merits on January 21, 1963. On January 31, 1963, this court filed its *per curiam* opinion (*Harris v. Shanahan*, 191 Kan. 1, 378 P. 2d 157) and said:

". . . we find that no declaration should now be made with respect to the invalidity of the existing apportionment statutes of the state Senate and to the seats in multi-district counties of the House of Representatives, and we withhold decision on the merits of all issues presented in order to afford the 1963 legislature full opportunity to heed the constitutional mandate to reapportion in accordance with Art. 10, §§ 1 and 2.

"If there is to be a judicial disruption of the present legislative apportionment or of the methods or machinery for electing members of the legislature it should not take place unless and until it can be shown that the 1963 legislature has failed to perform its constitutional duty to reapportion.

"Jurisdiction of this appeal is retained until further order of the court." (l. c. 2.)

Both houses of the 1963 legislature introduced bills to apportion their respective legislative districts. House bill No. 1 was introduced in the house and Senate bill No. 440 was introduced in the senate. The house bill fixed the membership of that body at 105 members and repealed G. S. 1961 Supp., 4-103. The bill passed the house, was amended and passed by the senate, and failed to achieve a constitutional majority upon roll call in the house to concur in the senate amendment. (Senate and House Journals, 1963 [H. J. p. 455].) Senate bill 440 repealed the 1947 apportionment of the senate (G. S. 1949, 4-102) and reapportioned the 40 seats of that body. (Laws 1963, Ch. 13.) Based upon the 1962 census of state population of 2,165,009, an average-sized senatorial district should contain approximately 54,125 people. As introduced and passed by the legislature, senate bill 440 apportioned the state into 40 districts of approximately equal population, none of which varied more than approximately 10 percent from the average population figure of 54,125. The bill represented diligent and good-faith effort by the legislature to achieve the standard of equality of representation demanded by Article 10, Section 2, as hereafter noted, and we believe the minds of reasonable men could not doubt that a range of variance above and below the average district of

not more than approximately 10 percent constituted as close an approximation to exactness as possible.

Subsequent to the adjournment of the 1963 legislature this court held hearings with respect to the validity of the 1961 apportionment of the multi-district seats in the house of representatives. (G. S. 1961 Supp., 4-103.) At the first hearing counsel for both parties orally stated that the 1963 apportionment of the senate met all the requirements of equal representation imposed by Article 10, Section 2, of the Kansas Constitution and that senate bill 440 should be judicially approved. Since that time, however, it has come to the court's attention that all of the city of Leawood in Johnson County, consisting of approximately 8,800 people, was omitted from senatorial district No. 15 and was not included in any senatorial district. When counsel advocated judicial approval of the bill, the omission of the city of Leawood was then unknown to counsel, to the legislature, to the governor, and to this court. Shortly after the omission was discovered this court ordered counsel to file written briefs on the validity of senate bill 440 and to present oral argument.

The state's supplemental brief suggests that the question of the validity of senate bill 440 may not now be inquired into since it was not one of the original issues of the case, but realizing the importance of the question, the gravity of the situation and the public welfare, it does not insist upon the point; rather, it states, "It is for the good judgment of this court to decide whether this new question shall be considered in this case."

The first cause of action attacked the validity of the 1947 apportionment of the senate, which was the apportionment then in effect. Senate bill 440 was enacted after this court had taken note of the circumstances and had admonished the legislature then in session to do its duty in accordance with the constitutional mandate, and the court reserved its jurisdiction over questions raised by the suit.

It is the general rule that once a valid apportionment law is enacted no future act may be passed by the legislature until after the next regular apportionment period prescribed by the Constitution. (*Jones v. Freeman,* 193 Okl. 554, 146 P. 2d 564; *Denney, Clerk, et al., v. The State, ex rel., Basler,* 144 Ind. 503, 42 N. E. 929; *The People v. Hutchinson,* 172 Ill. 486, 50 N. E. 599; *Parker, et al. v. The State, ex rel. Powell,* 133 Ind. 178, 32 N. E. 836, 33 N. E. 119; *People ex rel. Henderson v. Supervisors,* 147 N. Y. 1, 41 N. E. 563; *Harmison v. Ballot Com'rs* 45 W. Va. 179, 31 S. E. 394; 18 Am. Jur.,

Elections, § 14, p. 190.) The apportionment period provided in the Constitution does not, of course, require that the act be passed at a regular session, but a special session may be called for that purpose. (*The State ex rel. Attorney General vs. Cunningham*, 81 Wis. 440, 51 N. W. 724; 18 Am. Jur., Elections, § 14, p. 190.)

The existing apportionment of the house of representatives was enacted in 1961 and that of the senate in 1963. Thus, both being current in terms of time within the meaning of Article 10, Section 2, those acts are not subject to change by the legislature until the next constitutional apportionment period unless held to be invalid. Since there is a presumption that laws passed by the legislature are valid and constitutional until judicially determined to be otherwise, the legislature will be powerless to lawfully reapportion until the next apportionment period, unless this court adjudges the present senate apportionment act to be invalid. Accordingly, the effect of the omission of the city of Leawood from any senatorial district must be carefully considered at this time and touched upon in the court's opinion if opportunity for the correction of the senate apportionment is to be afforded prior to the primary and general elections in 1964.

The constitutionality of the 1963 act is clearly more critical now since the question whether it was duly and regularly enacted is sharply drawn into issue, and if decided in the negative, would leave the court necessarily deciding this case on the basis of the 1947 apportionment act (G. S. 1949, 4-102) originally attacked by plaintiffs' petition if there be no subsequently valid act to replace it. Accordingly, we are of the opinion, under the issues presented and the legal question which has subsequently arisen concerning senate bill 440, that the validity of the 1963 senatorial apportionment is required to be determined along with the remaining issues of the constitutionality of the 1961 act apportioning the house of representatives.

Hence, we turn to the contention of the parties as to the validity of senate bill 440. In deciding the question it will be helpful to set out in chronological order the legislative history of the bill. On March 27, 1963, the Senate Committee on Legislative and Congressional Apportionment introduced the bill to apportion the state into 40 senatorial districts and to repeal G. S. 1949, 4-102. The bill was read the second time on March 28, and referred to the Committee of the Whole Senate. On March 29, the Committee of the Whole

recommended that it be passed. On the same day and on an emergency motion, the bill was advanced to third reading and roll call and passed by a vote of 24 yeas and 6 nays. As introduced and passed by the senate, the designation of senatorial district No. 15 commenced on line 48 of the bill and ended on line 54. That part of the bill, including the line numbers, reads:

"48     15. *All of* Aubry and Oxford townships in Johnson county,
"49     *the city of Leawood in Johnson county, all of the territory in*
"50     precincts 3, 4, 5 and 6 of ward 2 and all of the territory in
"51     wards 3, 4 and 5 of the city of Overland Park in Johnson county
"52     and all of the territory in wards 4, 5 and 6 of the city of Prairie
"53     Village in Johnson county shall constitute the fifteenth senatorial
"54     district." (Emphasis supplied.)

The bill was messaged to the house on April 1, 1963, and read the first time. The following day the bill was read the second time and referred to the House Committee on Legislative Apportionment. On April 10, and with respect to senatorial district No. 15, the House Committee recommended the bill be amended:

". . . in line 48, by striking out all of the line after the word 'of'; by striking out all of lines 50 to 54, inclusive, and inserting in lieu thereof the following: 'all of precincts 4, 5 and 6 of ward 2 and precincts 3, 4, 5, 6 and 7 of ward 3, and all of wards 4 and 5 in the city of Overland Park in Johnson county and precinct 4 in ward 2 and all of wards 4, 5 and 6 in Prairie Village in Johnson county, shall constitute the fifteenth senatorial district.' . . ." (Senate and House Journals, 1963, [H. J. p. 455].)

Thus, it is noted that after the house committee amendments, the only portion remaining in the bill establishing senatorial district 15 was the emphasized portion quoted above. When that language is added to the language inserted by the house committee amendments, senatorial district No. 15 was established to include the following:

"All of the city of Leawood in Johnson county, all of the territory in all of precincts 4, 5 and 6 of ward 2 and precincts 3, 4, 5, 6 and 7 of ward 3, and all of wards 4 and 5 in the city of Overland Park in Johnson county and precinct 4 in ward 2 and all of wards 4, 5 and 6 in Prairie Village in Johnson county, shall constitute the fifteenth senatorial district."

On the same day, April 10, the committee recommended that the bill be passed as amended and the committee report was adopted by the house. On the same day, and on an emergency motion, the bill was advanced to third reading subject to amendment and debate. Thereupon the bill passed the house upon roll call by a vote of 90 yeas and 11 nays. On that same day, April 10, the senate

received the bill from the house as amended, and concurred in the house amendments by a vote of 28 yeas and 8 nays. On April 13, under the heading of "Report on Engrossed Bills," senate bill 440 was reported as correctly engrossed. On April 16, under the heading of "Report on Enrolled Bills," the journal of the senate shows that senate bill 440 was correctly enrolled, properly signed, and presented to the governor on that date for his signature. On April 16, under the heading of "Messages from the Governor" the journal of the senate shows that the bill was signed by the governor on April 17, 1963.

Enrolled senate bill 440 appears in the 1963 Session Laws as Chapter 13, pages 29 through 37. Beginning on page 30 of the fourth line from the top, the paragraph pertaining to senatorial district No. 15 reads as follows:

"15. All of precincts 4, 5 and 6 of ward 2 and precincts 3, 4, 5, 6 and 7 of ward 3, and all of wards 4 and 5 in the city of Overland Park in Johnson county and precinct 4 in ward 2 and all of wards 4, 5 and 6 in Prairie Village in Johnson county, shall constitute the fifteenth senatorial district."

From the foregoing it is obvious that the minds of the house and senate met in common agreement that senate bill 440, as amended by the house, be passed. At some later time, after passage of the bill by both houses, a variation appeared in the language establishing senatorial district No. 15, notwithstanding the senate committee's report that the bill was correctly engrossed and enrolled. Unfortunately, in the engrossing of the bill the language relating to the city of Leawood was omitted, and the remaining language of the house amendment was such as to give no warning of the omission. The enrolled bill blindly followed the language of the engrossed bill, which was approved and signed by the governor on April 17, 1963.

With the undisputed legislative record in mind, let us examine the specific question before us. Is the statute (Laws 1963, Ch. 13) void for the reason that the governor did not sign the bill passed by the legislature? The question requires an examination of our Constitution and previous decisions of this court as to its validity. The pertinent part of Article 2, Section 14, reads:

"Every bill and joint resolution passed by the house of representatives and senate shall, within two days thereafter, be signed by the presiding officers, and presented to the governor; if he approve, he shall sign it; but if not, he shall return it to the house of representatives, which shall enter the objections at large upon its journal and proceed to reconsider the same. . . ."

It is important here to state pertinent rules applicable to this constitutional provision which are essential to transferring a bill introduced in the legislature into a law. It has been held that the legislature and the governor exercise co-ordinate functions in enacting laws, and the governor is an essential part of the legislation. (*State, ex rel., v. Ryan,* 123 Kan. 767, 771, 256 Pac. 811; *State, ex rel., v. Robb,* 163 Kan. 502, 183 P. 2d 223.) Under this provision, until a bill has the final consideration of the three law-making powers, that is, the house, the senate, and the governor, it is not a law. (*State v. Sessions,* 84 Kan. 856, 868, 115 Pac. 641; *State, ex rel., v. City of Salina,* 108 Kan. 271, 194 Pac. 931; *State, ex rel., v. Ryan,* supra.) Hence, it is important that we keep in mind the distinction between a *bill* and a *law.* A bill never becomes a law until the constitutional prerequisites respecting the manner of enactment have been fully complied with. (50 Am. Jur., Statutes, § 97, p. 103; 82 C. J. S., Statutes, § 60b, p. 94.)

Another rule of long standing in this jurisdiction is that before an enrolled bill can be impeached successfully by the journals of the legislature, the latter must show affirmatively, clearly, conclusively and beyond all doubt that the bill as enrolled was not the bill passed. Also, that the records of the legislative journals import absolute verity and are conclusive as to the facts therein affirmatively shown. (*In re Taylor,* 60 Kan. 87, 55 Pac. 340; *Belleville v. Wells,* 74 Kan. 823, 824, 88 Pac. 47; *Smith v. Robertson,* 155 Kan. 706, 709, 128 P. 2d 260, and cases cited.)

Another rule requiring consideration is that it is the policy of the courts to uphold legislative intent rather than to defeat it, and if there is any reasonable way to construe legislation as constitutionally valid it will be so construed. Further, that doubts as to constitutionality always are resolved in favor of validity and statutes are not stricken down unless the infringement of the superior law is clear beyond substantial doubt. (*Hunt v. Eddy,* 150 Kan. 1, 90 P. 2d 747, and cases cited; *State, ex rel., v. Fadely,* 180 Kan. 652, 308 P. 2d 537.)

Counsel for both parties assert that this court has not only the power but also the duty to sustain the constitutionality of the act by supplying the words "the city of Leawood in Johnson county, all of the territory in" as the same appears in line 49 of senate bill 440 and as passed by both houses but omitted therefrom when the bill was engrossed and enrolled. It is argued that in many cases of

statutory construction the legislative intent can be derived only by inference or implication; that the present case is distinctly different in that specualtion or reasoning as to the legislative intent need not and cannot be resorted to; that the record plainly shows the legislative intent and the action it took was to include Leawood in the 15th senatorial district and there is no room whatever for dispute of that fact. They further argue that while the general rule as to ambiguity applies in many cases, it is not always applicable, and that words may be inserted in or added to a statute in order to effectuate the legislative intent; that it is within the power of a court whenever necessary to effectuate legislative intent to supply language in construing an act, inserting such words and clauses as may reasonably appear to be called for; that words may be supplied in a statute in order to give it effect, or to avoid repugnancy or inconsistency with the legislative intent, or where omission is due to inadvertence, mistake, accident or clerical error, or where omission makes the statute absurd and that omissions may be supplied to prevent unconstitutionality. A few of the authorities cited and relied upon are: II Sutherland, "Statutory Construction," 3d Ed. § 4924, pp. 453, 458; Endlich, "Commentaries on the Interpretation of Statutes," p. 399; *Commonwealth v. Barney*, 115 Ky. 475, 74 S. W. 181, 184; *State ex rel. McGrael v. Phelps*, 144 Wis. 1, 128 N. W. 1041; *Landrum v. Flannigan*, 60 Kan. 436, 56 Pac. 753; *State v. Brodigan*, 37 Nev. 245, 141 Pac. 988; *State v. Crockett*, 137 Tenn. 679, 195 S. W. 583; *Keenan v. Price*, 68 Idaho 423, 195 P. 2d 662.

We have no quarrel with the authorities cited, but they are not authority for the proposition which is sought to be drawn from them, that is, where the legislature passes one bill and another bill is presented to and signed by the governor, the court may reach out and draw from the legislative records the omitted portion of a bill and insert by judicial construction the omitted portion into law. The parties candidly concede there is no ambiguity in that part of the bill which established senatorial district 15. What they ask this court to do is not to construe the statute, but in effect, enlarge it so that what was omitted by inadvertence or error, may be included within its scope. To supply the omissions under these circumstances would transcend the judicial function. (*Iselin v. United States*, 270 U. S. 245, 70 L. Ed. 566, 46 S. Ct. 248; *Ayers v. Comm'rs of Trego Co.*, 37 Kan. 240, 242, 15 Pac. 229.) This court has the power to declare a legislative act invalid when it infringes the

superior law, but it has no power to correct or amend an act, or even construe it when expressed in plain and unambiguous language. The general rule is that where the statute is plain and unambiguous, there is no room left for judicial construction so as to change the language employed therein. (*Fitzpatrick v. Gebhart,* 7 Kan. 35.) In *Russell v. Cogswell,* 151 Kan. 793, 101 P. 2d 361, it was said:

". . . Errors plainly clerical in character, mere inadvertences of terminology, and other similar inaccuracies or deficiencies will be disregarded or corrected where the intention of the legislature is plain and unmistakable. But the court cannot delete vital provisions or supply vital omissions in a statute. No matter what the legislature may have really intended to do, *if it did not in fact do it, under any reasonable interpretation of the language used,* the defect is one which the legislature alone can correct." (l. c. 795.)

In *Ayers v. Comm'rs of Trego Co.,* supra, it was said:

"Regarding the contention that '31,' in § 7, chapter 70, Laws of 1883, should read '9,' we need only reply, that we have not the right to change the statute where it is clear and free from ambiguity, by any judicial interpretation. We have no authority to interpolate '9' in the statute in the place of '31' when '9' does not appear therein. As the statute is plain and unambiguous, there is no room left for construction. (*In re Hinkle,* 31 Kas. 712.) . . ." (l. c. 242.)

The rule is somewhat more limited than asserted by counsel. Generally speaking, courts have no right to correct errors made in an enrolled bill and they will ordinarily take the latter as they find it, and if not constitutionally enacted, will declare it void. (50 Am. Jur., Statutes, §§ 97, 232, 234, pp. 103, 219, 221; 82 C. J. S., Statutes, § 60b, p. 94.) Nearly all the cases holding that errors and mistakes may be corrected deal with errors and mistakes apparent on the face of the legislative enactment, either standing by itself or in connection with other well-known facts. Very few of such cases deal with the question whether the procedural steps in enacting the law have been followed; that is, whether the act signed by the governor was the act passed by the legislature. In other words, such cases deal in the main with the construction of the legislative enactment rather than the validity of the procedure or steps of its enactment. (*State v. Wright,* 62 Wyo. 112, 163 P. 2d 190.) In *State v. Hill,* 189 Kan. 403, 369 P. 2d 365, 91 A. L. R. 2d 750, it was held that the construction of a statute, the function of a court to ascertain its scope and meaning, is not to be confused with the duty of determining its validity when measured by constitutional guaranties.

We think that what was said and held in *State, ex rel., v. Robb,* 163 Kan. 502, 183 P. 2d 223, is decisive of the question. That was a mandamus action to compel the registration of county hospital bonds which the state auditor had refused to register because the amount of the bonds was more than the county was authorized to issue under G. S. 1935, 10-301, the general bond limitation statute. During the regular 1947 session a senate bill was introduced to amend 10-301 so that the limitation provided therein did not apply to county hospital bonds. At the same time house bill 131 was introduced to amend 10-301 in certain particulars, and passed the house. In the senate it was amended to exempt county hospital bonds from the general bond limitation statute. The bill passed the senate, as amended, and was messaged to the house which concurred in the amendment. When the bill went to the state printer to be enrolled, the senate amendment did not come to the attention of the employees and on return of the enrolled bill to the house and senate the omission of the amendment was unnoticed. In that form it was signed by the officers of the legislature and presented to the governor for his signature. As signed by officers of both houses and duly signed by the governor, the bill did not contain the amendment exempting county hospital bonds from the general bond debt limitation prescribed by 10-301.

There, as here, it was argued that where the legislative records clearly show the legislative intent and affirmatively show the action taken was to include the amendment—in the instant case to include that part of the original bill pertaining to the city of Leawood— the enrolled bill can be impeached successfully to show that it was the intention of both houses and the governor that the bill as passed by the legislature should be construed to be the effective bill, otherwise a clerical employee or printer can effectively thwart the purpose of the legislature and the governor and give to such errant and unknown clerk or printer the power to veto legislation.

The contention overlooks the fact that in the Robb case as well as in the instant case, a duly constituted committee of the legislature reported the bill, in the former case, to be correctly enrolled, and in the instant case, to be correctly engrossed and enrolled, when in truth and in fact they were not. Despite the fact that the mechanical work of engrossing bills is performed by clerical employees, the duly constituted committees of each body of the legislature cannot escape the responsibility of carefully examining all engrossed and enrolled bills. Had the committees done so in

the Robb case and in the instant case, the omissions would have been discovered and timely corrected. In the Robb case it was said:

"Plaintiffs argue this court should take judicial notice of what the enrolled bill contained and what the legislative journal contained, and of every step that might affect the validity or meaning of this statute. They argue that enrolled bills may be impeached by an examination of the legislative records of the house and senate, and that when that is done, it becomes clear that it was the intention of the house and senate and governor, that the bill as passed by both houses with the amendment added in the senate should be construed to be the effective bill. They point out that to hold otherwise would permit the enrolling clerk to impair or invalidate or change an act by dropping out a provision by inadvertence, carelessness or fraud, and that this would be obviously against public policy.

"To sustain this position plaintiffs cite and rely on the following Kansas authorities: *Comm'rs of Leavenworth Co. v. Higginbotham,* 17 Kan. 62; *Division of Howard Co.,* 15 Kan. 194; *Prohibitory-Amendment Cases,* 24 Kan. 700; and *Weyand v. Stover, Treas.,* 35 Kan. 545, 11 Pac. 355.

"Those cases are authority for a holding that this court will look behind the language of the enrolled bill to the legislative journals and other records when the constitutionality or meaning of a bill is being considered. They are not authority for the conclusion which plaintiffs seek to draw therefrom, that is, that where the house and senate pass one bill and the governor signs another, we should hold the bill passed by the house and senate to be the law. . . ." (l. c. 508, 509.)

Decisions from other jurisdictions were then reviewed and discussed at length, and it was said:

"The foregoing are the authorities upon which plaintiffs rely. . . . They seem to fall into two classifications, one where a typographical or clerical error was corrected—the other where by signing a bill with a large figure in it the governor was held to have in effect approved a bill with a smaller figure. The fact is, these opinions, most of them seem to have been based on reasons of expediency rather than any well-reasoned philosophy of constitutional law.

. . .

"In the making of laws under our constitution the governor and the legislature are co-ordinate branches. That is the way the writers of the constitution intended it should be. The one is about as important as the other. The court will not for reasons of expediency reach a conclusion that will enable either one to bypass the other." (l. c. 515, 516.)

The court then quoted Article 2, Section 14 in full, heretofore quoted in part. Referring to this provision, the court said:

"This section is clear. There can be no doubt but that each bill passed must be presented to the governor, and if he approves it he shall sign it, and if not he shall return it with his reasons. The rest of the section deals with the power of the legislature to override a veto by a vote of two-thirds.

"The judiciary is merely one of the three branches of the state government. It should be slow to approve any action which even has the semblance of

permitting one branch to act toward another in a manner contrary to the terms and provisions of the constitution.

.   .   .   .   .   .   .   .   .   .   .   .   .

"In *Vaughn & Ragsdale Co. v. State Board, etc.,* 109 Mont. 52, 96 P. 2d 420, the subject received careful consideration. The court held:
" 'The legislature alone cannot enact a law; it has the power to pass bills which may become laws when signed by the presiding officers of both houses and when approved and signed by the governor, these officers being an indispensable part of the machinery set up by the Constitution to make laws.' (p. 52.)" (l. c. 517.)

In denying registration of the bonds it was only necessary for the court to consider the validity of the omitted amendment and whether it became law; the court was not required to further consider the validity of house bill 131 itself. On that point a concluding sentence of the opinion is noteworthy, "The fact remains, however, that the bill that passed the legislature never was submitted to the governor." It was held that Article 2, Section 14 requires that bills passed by the legislature be submitted to the governor for his signature and where a bill was submitted to the governor without an amendment which had been adopted by both houses, the amendment did not become law. See, also, *Vaughn & Ragsdale Co. v. State Board, etc.,* supra; *Katerndahl v. Daugherty,* 30 Idaho 356, 164 Pac. 1017; *State v. Wright,* supra; *State ex rel. Foster v. Naftalin,* 246 Minn. 181, 74 N. W. 2d 249; *Slauson et al. v. The City of Racine,* 13 Wis. 398, and *Denney, Clerk, et al. v. The State, ex rel., Basler* supra.

We assume that the intention of both houses of the legislature and of the governor was to enact a law which gave adequate senatorial representation to every citizen of Kansas, including the residents of the city of Leawood. No one questions that fact. But we are confronted with what was done, not what the legislature may have really intended to do. Hence, what was said and held in the Robb case is equally applicable in the instant case. The difference is slight. There we were concerned with an amendment to a bill passed by both houses of the legislature, which was omitted when the bill was enrolled and when signed by the governor, and here with a bill which was amended and passed by both houses, but when engrossed and enrolled and signed by the governor, a portion of the original bill was omitted. In the Robb case, the amendment was as much a part of the bill when it passed both houses of the legislature as was that part of line 48 and all of line 49 of senate bill 440 when it passed both houses of the legislature

following the house amendment. However, the omitted language in both was not in the enrolled bills when presented to and signed by the governor. Efforts to distinguish the Robb case from the instant case because there the omission "was an amendment," because it "dealt with an enactment—which would amend the general bonded debt limitation law" and "was purely within the discretion of the legislature," whereas in the instant case, "the legislature was under a constitutional mandate to reapportion the senate," or, because the omission left the original bill in the instant case less clear and effective "for the purpose for which it was introduced," are not well taken. Both cases deal with acts of the legislature which are subject to the requirements of the Constitution. The long and short of this case is that the bill passed by both houses of the legislature was not the bill approved and signed by the governor and this court has no authority to insert what was omitted. The requirements of Article 2, Section 14, are mandatory that the governor sign the same bill which passed the legislature. It follows that the enrolled bill the governor signed (Laws 1963, Ch. 13) was not made into law in the form and manner prescribed, and is a void enactment.

Due to the nature of senate bill 440 and its importance to the people of the state, we have examined the question somewhat at length. It is to be deeply regretted that as important a law as this, covering a subject of great public interest, should, because of gross carelessness of someone, be wiped bodily from the statute book. But the court is not responsible for this; nor can it usurp the functions of the legislature or the governor, and, by shutting its eyes to the undisputed legislative record, declare a bill as passed by both houses of the legislature, which was never presented to the governor nor approved by him, to be a valid law. It is lamentable that error on the part of engrossing clerks and legislative committees should defeat the action of the legislature. But the strict rule calling for full compliance with constitutional requirements is, in the long run, a good one. In some cases it may work a hardship, but, by and large, it is beneficial to our republican form of government. (*State ex rel. Foster v. Naftalin,* supra.)

The parties have raised other questions but in view of the conclusion just announced, it is unnecessary to consider them. For reasons hereafter stated, we do not consider whether G. S. 1949, 4-102, the 1947 Apportionment Act, is unconsitutional for the reasons alleged in the first cause of action.

As preliminary to discussing remaining questions we note briefly the state's constitutional history as pertains to the legislative department. When our Constitution was adopted in 1859, original Article 2, Section 2, provided that the first house of representatives would consist of 75 members chosen for one year and the first senate would consist of 25 members chosen for two years, and after the first election the number of senators and members of the house of representatives was to be regulated by law, but never to exceed 100 representatives and 33 senators.

In 1873 a major constitutional change affecting apportionment was made by the legislature. At that regular annual session it submitted Article 2, Section 2, hereafter quoted, enlarging both houses of the legislature, which was adopted by the people at the general election held November 4, 1873. While 100 members were admitted and sworn as representatives at the 1873 Session (*Prouty v. Stover, Lieut. Governor,* 11 Kan. 235), no one could foresee how many new counties would be organized in a growing state, nor how many counties Kansas would ultimately have when all its territory was placed in organized counties. With the formation of five western counties in 1887, the last of the present 105 counties were organized. (Laws 1887, Chs. 2 and 81.) However, from 1888 to 1893 Kansas had 106 counties, the extra county being Garfield which was organized in 1887 by taking territory from Finney and Hodgeman counties. (Laws 1887, Ch. 81.) In 1893 this court declared Garfield County to be illegally organized. (*State, ex rel., v. Comm'rs of Garfield Co.,* 54 Kan. 372, 38 Pac. 559.)

The plaintiffs allege federal constitutional violations, the most material of which are denial of equal protection of the law and due process of law in violation of the Fourteenth Amendment. With the dismissal of the second cause of action it becomes unnecessary for this court to determine whether an apportionment of the state into 105 representative districts on a geographical basis pursuant to Article 2, Section 2, and Article 10, Section 1, offends concepts inherent in the American system of republican government which were approved by Congress when Kansas was admitted to the Union on January 29, 1861 (12 Stat. 126), and whether the legislature, in voting for ratification of the Fourteenth Amendment in 1867 (Laws 1867, Ch. 3), rendered our Constitution under which it was then assembled, to be unconstitutional and in violation of the amendment ratified. Hence, in view of conclusions hereafter announced, any possible federal question is removed from the case,

and our consideration of remaining questions is limited solely to whether the 1961 Apportionment Act discriminates in the apportionment of the 20 "extra" seats in the house of representatives, and violates Article 10, Section 2 of the Constitution of Kansas, as alleged in the third cause of action.

This brings us to a consideration of pertinent provisions of the Kansas Constitution, which read:

"The legislative power of this state shall be vested in a house of representatives and senate." (Art. 2, Sec. 1.)

"The number of representatives and senators shall be regulated by law, but shall never exceed one hundred and twenty-five representatives and forty senators. From and after the adoption of the amendment the house of representatives shall admit one member from each county in which at least two hundred and fifty legal votes were cast at the next preceding general election; and each organized county in which less than two hundred legal votes were cast at the next preceding general election shall be attached to and constitute a part of the representative district of the county lying next adjacent to it on the east." (Art. 2, Sec. 2.)

"At the general election held in eighteen hundred and seventy-six, and thereafter, members of the house of representatives shall be elected for two years, and members of the senate shall be elected for four years." (Art. 2, Sec. 29.)

"In the future apportionment of the state, each organized county shall have at least one representative; and each county shall be divided into as many districts as it has representatives." (Art. 10, Sec. 1.)

"It shall be the duty of the first legislature to make an apportionment, based upon the census ordered by the last legislative assembly of the territory; and a new apportionment shall be made in the year 1866, and every five years thereafter, based upon the census of the preceding year." (Art. 10, Sec. 2.)

The purport of Article 2, Section 2, and Article 10, Section 1, simply means that the number of representatives constituting the house of representatives, and the number of senators constituting the senate, shall be regulated by law; that the number of representatives and senators as regulated by law shall never exceed 40 senators and 125 representatives, but the number of representatives shall be not less than the number of organized counties which cast at least 250 legal votes at the last preceding general election. (*State, ex rel., v. Francis, Treas'r.*, 26 Kan. 724.) The qualification that a county must cast 250 votes in order to have separate representation is virtually meaningless today since the 1909 Reapportionment Act (Laws 1909, Ch. 196) gave all 105 counties at least one representative, and there has been no change since that time in the number of counties entitled to representation in the house of representatives. (Reapportionment of the Kansas Representatives, Research De-

partment, Legislative Council, Bulletin 181, December 1952.) In conformity ·with Article 2, Section 2, the legislature has provided that the senate shall consist of 40 members and the house of representatives shall consist of 125 members. (G. S. 1949, 4-101.)

As noted, Article 10, Sections 1, 2 and 3, deals with the apportionment of the legislature and has not been changed since adopted in 1859. While the Constitution of the state of Ohio was a model for the Constitution of Kansas (Proceedings and Debates, Wyandotte Constitutional Convention, 1859, pp. 39, 40; *Markham v. Cornell*, 136 Kan. 884, 18 P. 2d 158; *State, ex rel., v. Fadely*, supra), Mr. Graham, of Atchison County, a member of the apportionment committee, in the debate upon those sections said that the precedent followed was the Pennsylvania Constitution of 1838. The first part of Section 1, "each organized county shall have at least one representative" was a part of Article 1, Section 4, of the Pennsylvania Constitution. The remainder of the section differs in words, but carries out the purpose of the Pennsylvania provision. Section 2, providing for apportionment according to census, though following in part Article 1, Sections 4 and 7 of the Pennsylvania Constitution, was for several reasons almost entirely original. First, the territorial legislature had ordered a census to be taken, so the first apportionment was to be based upon that report; second, the population was growing so rapidly that the committee thought best to apportion the state every five years instead of waiting ten years as is provided in other state Constitutions. By fixing the first apportionment in 1866 it could be based upon the census provided for by the 1865 legislature. Section 3 merely made temporary apportionment for both senators and representatives as was done in the Constitution of other states and as was done by the Topeka Constitution. From the nature of the subject matter the wording of Article 10 is very near original, though the precedents of Pennsylvania, New York, Wisconsin and Illinois were followed in theory. (Perdue: Sources of Constitution, Proceedings and Debates, Wyandotte Constitutional Convention, 1859, pp. 689, 690.)

When the founding fathers wrote the Constitution of the United States they enthusiastically established a republican form of government which became the cornerstone of American written constitutions. (James Madison's report of the "Debates in the Federal Convention of 1787" [House Document No. 398, 69th Congress, first session, entitled "Documents Illustrative of the Formation of the

Union of the United States of America."].) So there could be no mistake about its object and purpose, the American Republic officially and with the first breath of its new life declared, "that all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty and the pursuit of Happiness. That to secure these rights, Governments are instituted among Men, deriving their just powers from the consent of the governed." (The Declaration of Independence.) This is the American proclamation of freedom and equality, and the individual worth of a single human being. Within its designated sphere of constitutionally allocated powers, and subject always to its guiding purpose as stated in the Declaration of Independence, the American system of Government was designed to function through representatives chosen by the people and responsible to them on regularly recurring election days. Article 4, Section 4, of the Constitution of the United States guarantees to every state in the Union a republican form of government and every sentence and provision of the Kansas Constitution evidences principle of that form of government declaring and guaranteeing the liberties of the people. A distinguishing feature of this form of government is that the people are capable of self-government and have the right to choose their own officials for governmental affairs and enact their own laws pursuant to the legislative power reposed in representative bodies. This representative system is the essence of the republican form of government and is premised upon the fact that the people cannot speak in mass, and the right to choose a representative is every citizen's portion of sovereign power.

Within the express and implied provisions of the Constitution of Kansas every qualified elector of the several counties is given the right to vote for officers that are elected by the people, and he is possessed of equal power and influence in the making of laws which govern him. (Bill of Rights, Kansas Constitution, Sections 1, 2.) Insofar as he is accorded less representation than is his due under the Constitution, to that extent the governmental processes fail to record the full weight of his judgment and the force of his will. The apportionment provisions were designed to guard that equality of representation so necessary to protect our citizens against the usurpation of governing power and resulting taxation without representation, and the intent and purpose of Article 10, Sections 1 and 2 may be simply stated: The legislature is directed to appor-

tion the state every fifth year after the year of 1866 into substantially equal legislative districts based upon the state's population for the preceding year, except that each organized county shall have at least one representative, and each county shall be divided into as many districts equal in population as it has representatives. The census used for this purpose is the official state census which is made on an annual basis. ( G. S. 1949, 11-101, *et seq.*, as amended; *Turner v. Comm'rs of Neosho Co.*, 27 Kan. 639, 641; *State, ex rel., v. Montgomery County Comm'rs*, 125 Kan. 379, 381, 264 Pac. 84.)

The provisions requiring the legislature to provide a new apportionment every five years are mandatory and not subject to legislative discretion. This requirement is a mandate from the people and the legislature cannot, either by positive action or by inaction, alter our Constitution under which it has its own existence. The exercise of discretion and good faith by the legislature in enacting an apportionment law must be limited to the standards provided in our Constitution and not to some other which the Constitution has not fixed. This is not to say, however, that there is not an element of discretion involved in the enactment of any legislative apportionment. Subject to the requirement of equal population provided by Article 10, Section 2, the location of boundaries, the shape, area, and other relevant factors are proper considerations for the legislature in the enactment of such a statute. Indeed, geographical considerations are necessarily attendant in the accomplishment of this purpose for the resulting districts should, where possible, be compact and contain a population and area as similar as may be in its economical, political and cultural interests, all as determined by the legislature in its discretion, not acting arbitrarily or capriciously.

Subject, then, to geographical limitations of the house of representatives, Article 10, Sections 1 and 2, contemplates equal representation and such requirement will not be satisfied with less than such equality as common justice and ordinary knowledge of our territory and population would suggest. Perfect exactness in the apportionment of the legislature in accordance with the census of the preceeding year is neither required nor possible, but there should be as close an approximation to exactness as possible and this is the utmost limit for the exercise of legislative discretion. (*Prouty v. Stover, Lieut. Governor*, supra.) In *Ragland v. Anderson, &c.*, 125 Ky. 141, 100 S. W. 865, the Supreme Court of Kentucky considered this question, and said:

". . . We have not been referred to a more accurate or better description of the equality required by the Constitution that that contained in the report of Daniel Webster, as chairman of a senatorial committee engaged in a duty similar to that involved in the act under discussion: 'The Constitution, therefore, must be understood not as enjoining an absolute relative equality, because that would be demanding an impossibility, but as requiring Congress to make an apportionment of representatives among the several states, according to their respective numbers, as nearly as may be. That which cannot be done perfectly must be done in a manner as near perfection as can be. If exactness cannot, from the nature of things, be attained, then the nearest practicable approach to exactness ought to be made. Congress is not absolved from all rule, merely because the rule of perfect justice cannot be applied. In such a case approximation becomes a rule. It takes the place of the other rule, which would be preferable, but which is found inapplicable, and becomes itself an obligation of binding force. The nearest approximation to exact truth or exact right, when that exact truth or exact right cannot be reached, prevails in other cases, not as a matter of discretion, but as an intelligible and definite rule, dictated by justice, and conforming to the common sense of mankind—a rule of no less binding force in cases to which it is applicable, and no more to be departed from than any other rule.' " (l. c. 158, 159.)

The definition of equality of representation above set forth, and the principle that an apportionment statute which violates its requirements is void, is adopted by this court as the proper standard to be used by the legislature in apportioning the state in legislative districts in accordance with Article 10, Sections 1 and 2.

There should be no misunderstanding as to the function of this court in the case at bar. It is sometimes said that courts assume a power to overrule or control the action of the people's elected representative in the legislature. That is a misconception. First, the duty of reapportionment is legislative in nature and is committed by the Constitution to the legislature, and courts cannot make a reapportionment themselves. Second, conforming to concepts inherent in American republican form of government, the Constitution of Kansas distributes the powers of government to three distinct and separate departments, i. e., the Executive, Legislature, and Judicial. The judiciary interprets, explains and applies the law to controversies concerning rights, wrongs, duties and obligations arising under the law and has imposed upon it the obligation of interpreting the Constitution and of safeguarding the basic rights reserved thereby to the people. In this sphere of responsibility courts have no power to overturn a law enacted by the legislature within constitutional limitations, even though the law may be unwise, impolitic or unjust. The remedy in such a case

lies with the people. But when legislative action exceeds the boundaries of authority limited by our Constitution, and transgresses a sacred right guaranteed or reserved to a citizen, final decision as to invalidity of such action must rest exclusively with the courts. In the final analysis, this court is the sole arbiter of the question whether an act of the legislature is invalid under the Constitution of Kansas. (*Quality Oil Co. v. du Pont & Co.,* 182 Kan. 488, 493, 322 P. 2d 731.) However delicate that duty may be, we are not at liberty to surrender, or to ignore, or to waive it. Every citizen and qualified elector in Kansas has an undoubted right to have the districts for representatives and senators created in accordance with the Kansas Constitution, and has a further right to invoke the power of the courts to protect such constitutional right. It is axiomatic that an apportionment act, as any other act of the legislature, is subject to the limitations contained in the Constitution, and where such act exceeds the bounds of authority vested in the legislature and violates the limitations of the Constitution, it is null and void and it is the duty of courts to so declare. It is not enough that one legislative district is of the proper size theoretically so long as other districts are given greater or less representation than is warranted by the Constitution and their population. The provisions of an act apportioning the state into legislative districts are so largely dependent on each other that if some of the districts are unconstitutionally apportioned, the entire apportionment is void.

The population statistics and related mathematical conclusions presented by plaintiffs were admitted by the defendants, and in passing upon the legal question presented in addition to the stipulation of the facts of the parties, this court takes judicial notice of any and all official publications of the Kansas State Department of Agriculture, the Secretary of State of Kansas, and any other public official or bureaus of the state which pertain to the official state census, the population of the state of Kansas, or of any of the counties, townships or cities located therein or which relate to the population of any of the districts in the house of representatives.

The admitted and stipulated facts of this case show on their face that the same commendable results achieved for the senate when the legislature passed senate bill 440 has not, unhappily, been reached with respect to the distribution of the 20 "extra" seats in the house of representatives and the apportionment of districts

within multi-district counties. Subject to the geographical apportionment, the same requirement of equality of representation applicable to the senate is also applicable to the house of representatives, and as noted from the population statistics set forth in Appendix A and B to this opinion, there has been no compliance with that requirement. The stipulated facts show that the official 1960 population of Kansas was 2,130,579, and this was the census for the year preceding the 1961 apportionment of the house of representatives. (G. S. 1961 Supp., 4-103.) Examining the act in the light of that census, Barton County, with a population of 34,147, was given two representatives with an average district population of 17,073. By contrast, the act gave Sedgwick County, with a population of 325,399, five representatives with an average district population of 65,079. This disparity of equality of representation is approximately 282 percent, and other multi-district counties show a similar disparity of average representation. In addition, the stipulation reflects a grossly unequal population basis as between districts within the same county. The act assigned Leavenworth County two representative districts, one having a population of 23,707 and the other with a population of 14,214. Johnson County was assigned three representative districts, one having a population of 66,420 and another having a population of 29,500. Reno County was assigned two grossly disapportioned districts, one having a population of 50,451 and the other having a population of 9,518 reflecting an apportionment based on unequal population of a ratio of better than 5 to 1. On its face the act offends fundamental concepts inherent in our republican form of government and makes out a prima facie case of unequal representation so great that it repels any presumption there exists a fair approximation of what is required by Article 10, Section 2, and compels the conclusion that the challenged act is void and ineffective.

When our Constitution was adopted there were 40 organized counties, and after the first election the membership of the house of representatives was to be regulated by law but never to exceed 100 representatives. When Article 2, Section 2 was amended in 1873 there were 68 organized counties and the membership was enlarged not to exceed 125. Thus, there always were "extra" seats to be apportioned on the basis of population. It was recognized by those who framed the Constitution that a mathematical exact division of those seats would be impossible because there were no

fractional representative districts—Article 10, Section 1 provides that "each county be divided into as many districts as it has representatives." The task would be simple if, in regulating by law the number of representatives, the legislature would reduce the number to 105, or, if not reduced, if the population of the state were divided by 125 and the quotient could be divided evenly into the population of each county. Unfortunately, under the latter, such a perfect result is unlikely, so the legislature is faced with the problem of apportioning whole seats to the extent indicated by population subject to the constitutional requirement that each county have at least one representative, and then opportion the remaining or "extra" seats in accordance with some formula which treats of the remaining fractions so as to produce "as close an approximation to exactness as possible" in conformity with the apportionment mandate.

The problem is not unsurmountable and has been the subject of much scientific thought and research, and legislative and judicial approval. Congress has been confronted with the problem after every decennial census for over a hundred years. The Federal Constitution provides that one representative shall be assigned to each state and no problem would be presented if the house of representatives consisted of 50 members. However, Congress has fixed the membership of that body at 435 (2 U. S. C. A. § 2), leaving 385 seats to be assigned to the several states on the basis of population. The only difference between the congressional problem and that of the Kansas legislature is that Congress has a greater number of seats to "play with" than the 20 "extra" seats in the Kansas house of representatives. The state of Arkansas has been confronted with a similar problem. The Constitution of that state (Constitution of Arkansas, Art. 8, §§ 1 through 6), fixes the membership of its house of representatives at 100 and provides that each of its 75 counties shall be entitled to at least one representative. Likewise, the state of New Jersey has experienced the same difficulty. Article 4, Section 3 of the Constitution of New Jersey, 1947, provides that the members of the General Assembly (the equivalent of our house of representatives) shall never exceed 60 and that its members shall be apportioned among the several counties as nearly as may be according to the number of their inhabitants but each of the 21 counties shall at all times be entitled to one member.

According to an eminent mathematician, a study of the problem was made in 1921 showing there were five methods which are work-

able and which avoid what the author referred to as the "paradoxes." (Edward V. Huntington, Department of Mathematics, Harvard University: "A Survey of Methods of Apportionment in Congress," 76th Congress, 3rd Session, Senate Document No. 304, p. 1.) They are: (1) Method of major fractions; (2) method of equal proportions; (3) method of harmonic mean; (4) method of smaller divisors, and (5) method of greater divisors. See, also, "Report of the National Academy of Science to the Speaker of the House of Representatives," February 4, 1929 (entered in Congressional Record, 70th Congress, 2d Session, Vol. 70, Part 5, pp. 4966, 4967); "Report Upon the Reapportionment of Representatives by the Advisory Committee to the Director of the Census," submitted to the Senate Committee on Census, 1921 (entered in Congressional Record, 69th Congress, 1st Session, Vol. 67, Part 7, pp. 7078, 7080); Schmeckebier, "Congressional Apportionment," The Brookings Institution, 1941; "Report of Committee on Apportionment of the American Political Science Association," 1950. (Reprinted in *The American Political Science Review,* Vol. 45, No. 1, Mar. 1951, pp. 153-157.) Huntington's study reads, in part:

In this study, in order to meet realistically the actual situation in Congress when an apportionment bill is up for debate, the emphasis is shifted from the process of computation to the tests of fairness which the final result should satisfy. The fairness of the final result, not the technical process of achieving this result, is regarded as the important thing. For example, suppose an actual apportionment bill proposes to give Alabama 9 seats, Arizona 1, Arkansas 7, etc., in a House of any given size (say 435). The fundamental question which Congress (our legislature) has to face is this: Does the distribution proposed in the bill put each State (county) as nearly as may be on a par with every other State, or would the bill be 'improved' by transferring a seat from such-and-such a State to such-and-such another State?

"To answer this question, Congress must decide what goal or aim it has in mind when discussing proposed 'improvements' in a given bill. It is generally agreed that Congress, consciously or unconsciously, has had two principal aims in view: First, to equalize the 'congressional districts' among the several States; and secondly, to equalize the 'individual shares' among the several States. What the modern mathematical theory has done is to establish clearly the relations between these two aims and the five possible methods listed above.

"The mathematical facts are as follows: The method of smallest divisors and the method of greatest divisors fail on both these aims; the method of major fractions fails on the first aim; the method of harmonic mean fails on the second aim; the method of equal proportions achieves both aims."

Without detailing the congressional history with respect to the apportionment of representatives among the several states in ac-

cordance with the pertinent part of Section 2 of the Fourteenth Amendment, it is sufficient to say that Congress wrote into federal law that the number of representatives to which each state would be entitled under an apportionment of the then existing number of representatives would be ascertained by the method known as the method of equal proportions. (2 U. S. C. A. § 2a.)

The method of equal proportions has been approved by two scientific bodies: The Advisory Committee to the Director of the Census, in 1921, and the National Academy of Sciences, in 1929. The report of the Census Advisory Committee concludes as follows: "The method of equal proportions, consistent as it is with the literal meaning of the words of the Constitution, is logically superior to the method of major fractions." The report of the National Academy of Sciences concludes as follows: "The method of equal proportions is preferred by the committee because it satisfies the test (of proportionality) when applied either to the sizes of congressional districts or to numbers of Representatives per person, and because it occupies mathematically a neutral position with respect to emphasis on larger and smaller States." (Edward V. Huntington, Department of Mathematics, Harvard University: "A Survey of Methods of Apportionment in Congress," 76th Congress, 3rd Session, Senate Document No. 304, p. 2.)

The state of Arkansas has a board composed of the governor, attorney general and secretary of state, which is charged with the duty of apportioning and reapportioning senators to senatorial districts, and representatives to its 75 counties. Its Constitution directs that after one representative was assigned to each county, regardless of the county's area or population, the remaining 25 shall, as nearly as practicable, be equally distributed among the more populous counties, "in accordance with a ratio to be determind by the population of said counties as shown by the federal census next preceding any apportionment." (*Shaw, Autry and Shofner v. Adkins, Gov.*, 202 Ark. 856, 153 S. W. 2d 415, Syl. ¶ 2.) Actions were filed against the apportionment board attacking the method of assignment of representatives to multi-district counties. In that case, the Supreme Court of Arkansas considered the five methods of apportionment and fully explained and illustrated the operation of each method, and concluded that because the method of equal proportions had been approved by scientific bodies and because it appeared to give the best results insofar as apportioning

the state of Arkansas was concerned, that method was adopted as being applicable to the apportionment of representatives in accordance with the Arkansas Constitution. In the opinion it was said:

"According to Schmeckebier [supra], no modern method of apportioning representatives uses any ratio in determining the result. A ratio, he says, is often referred to, but it is obtained *after* the apportionment is made from a so-called *priority list*. All modern methods—equal proportions, major fractions, harmonic mean, smallest divisors, and greatest divisors—assign the representatives to each state, in the case of congressional action, and to each county, in the case of state procedure, by means of priority lists, which indicate the apportionment to be made from the definite number—in Congress, ordinarily 435, and in Arkansas definitely 100. As the federal Constitution provides that one representative shall be assigned to each state, no question of priority would exist if the house consisted of 48 members. Each state obtains one representative, regardless of its population. Therefore, the priority list begins with the forty-ninth member of the house, and when completed it shows which states would receive additional members for any size house. As applied to reapportionment in Arkansas, the priority list begins with the member which we may designate as 76. In reality, priorities relate only to 25 members. Under our constitutional provision, the division of these 25 representatives is in accordance with a *ratio* to be determined by the population of *such* counties, exclusive of the remaining 75; hence, the priority list must be compiled and the ratios ascertained." (l. c. 862, 863.)

In *Asbury Park Press, Inc. v. Woolley,* 33 N. J. 1, 161 A. 2d 705, the Supreme Court of New Jersey, following *Shaw, Autry and Shofner v. Adkins, Gov.,* supra, and in speaking of the five mathematical formulas used in the apportioning of representatives, said:

". . . Informed students of these formulas speak of some of them as favoring the larger counties or states, while others favor the smaller ones. One formula, the method of equal proportions, seems generally to be regarded as producing the smallest relative differences in population per assemblyman and the smallest relative difference in the individual share in an assemblyman. . . ." (l. c. 9.)

Much more could be said on the subject, but it is sufficient to say that from the authorities classed as experts, from congressional action, and from the highest courts of the states which have considered the question, the method of eqal proportioning is generally regarded as producing the smallest relative difference in population per representative, and the smallest relative differences in the individual share in a representative. The fact that the National Academy of Sciences has given its endorsement to the method of equal proportions in preference to other systems, is highly persuasive, and we are of the opinion that this is the method which produces as close an approximation to exactness as possible in the apportionment of

the 20 "extra" seats in conformity with the constitutional mandate to apportion the state into substantially equal legislative districts and each county should be divided into as many districts equal in population as it has representatives. Apportionment by such formula in good faith to the Kansas population would result in an allocation of seats to the counties based upon population which could not be challenged as inequitable. That is not the case with respect to the existing apportionment of the house of representatives. When the method of equal proportions is applied to the 1961 apportionment act, considered in the light of the 1960 census, certain counties are assigned more representatives and other counties are assigned less respresentatives than they are entitled to by population.

As we have seen, the 1963 regular session failed to enact valid apportionments of the house of representatives and senate for reasons hertofore related. However, the duty to properly apportion legislative districts is a continuing one, imposed by constitutional mandate upon the legislature, notwithstanding the failure of any previous session to make such a lawful apportionment, and this duty may be performed prior to commencement of the next pending electoral process by a special session called by the governor for that purpose pursuant to Article 1, Section 5 of the Kansas Constitution. The parties are agreed that notwithstanding the effect of this opinion holding the 1961 and 1963 apportionment acts to be unconstitutional and void in violation of Article 10, Section 2, and Article 2, Section 14, the legislature may meet at the call of the governor in special session and lawfully enact valid apportionment acts. The appellants suggest, however, that from the time of the election of each of the 125 representatives in 1962 and the 40 senators in 1960 until the date of this decision declaring the 1961 and 1963 apportionment acts to be unconstitutional and void, each member was a *de facto* legislator and his acts were acts of a *de facto* official, and that upon the filing of this opinion, those who were so elected have no power to respond to the proclamation of the governor calling a special session and to enact new apportionment laws in conformity with the requirements of our Constitution. The point is not well taken. In the first place, the legal status of the members of the house and senate is not reached in this suit, for it seeks only to bar use in the future of any existing invalid apportionment statutes as the basis for electing members of succeeding legislatures and not to oust present members of either the house or senate, or to chal-

lenge their right to sit. In the second place, when each of the present 125 members of the house and 40 senators was duly elected, he was elected from a district then created by law for a term of two years and four years, respectively. (Article 2, Section 29.)

In *Farrelly v. Cole*, 60 Kan. 356, 56 Pac. 492, it was held that the matter of apportionment is only a provision for future elections; and is not designed to affect the title to office or the tenure of the members making the apportionment; that a member of the legislature, unlike a county or township officer, has no official functions to perform within the district or territory from which he is elected; that members of the legislature are constitutional officers with fixed terms of office and are entitled to hold their respective offices for the constitutional period they were elected, and in the absence of a provision expressly provided when their term shall begin, it is competent for the legislature to fix the commencement of the term. This has been done by statute (G. S. 1949, 25-316) which provides that the regular term of office for members of the house and senate shall commence on the second Tuesday in January next succeeding their election. Article 2, Section 8 declares that each house "shall be judge of the elections, returns and qualifications of its own members." This is a grant of power, and constitutes each house the ultimate tribunal as to the qualifications of its own members. The power is exclusively vested in each house and cannot by its own consent, or by legislative action, be vested in another tribunal or officer, and the power continues during the entire term of office, (*State, ex rel., v. Gilmore*, 20 Kan. 551; *State, ex rel., v. Tomlinson*, 20 Kan. 692, 702.) It follows that when a member of the legislature is duly and regularly elected from a legislative district then created by law and his election and qualifications have been approved by the house to which he was elected and he takes the oath of office prescribed by law, he is entitled to exercise the legislative powers of his office during the term for which he was elected, at any regular or budget session or at a special session called by the governor. The fact that the present members of the legislature were duly elected from legislative districts under the 1947 apportionment law of the senate and the 1961 apportionment act of the house, which are declared to be unconstitutional and void by this opinion, does not preclude such members from meeting at a budget session or at a special session. They are *de jure* officers for the term for which they were elected and competent to enact legislation at either of those sessions, including at a special session, apportionment statutes

apportioning the state into equal or substantially equal legislative districts. (*State v. Latham & York,* 190 Kan. 411, 426, 375 P. 2d 788.)

The 1964 election is the next election of members of the legislature. The holding of this election will take place at a definite known date under the existing apportionment statutes unless the defendants are restrained from using them, or the legislature enacts new valid apportionment prior to such election. Under G. S. 1949, 25-204 and 25-311, the secretary of state is charged with initiation of acts precedent to the holding of primary and general elections, that is, the preparation of notices of the primary election and the certification of nominees for the general election. That process will be initiated by him by giving notices of the 1964 primary election on or before April 2, 1964. (G. S. 1949, 25-204.) Information as to representative and senatorial districts must necessarily be in his hands for a sufficient time prior to that date to permit proper preparation of the required notices.

It is a matter of public knowledge that the legislature will convene in budget session on the second Tuesday in January, 1964, for 30 days and then adjourn. (Art. 2, Sec. 25.) This court feels certain that the governor will invoke constitutional processes and call the legislature into special session which will then be assembled at the state capitol, and that the legislature will enact valid apportionment acts apportioning the state into legislative districts pursuant to Article 2, Section 2, and Article 10, Sections 1 and 2 of our Constitution. Accordingly, if reapportionment of the state is accomplished in full compliance with the constitutional mandate, it may not be set aside by this court during its constitutional life and would not be subject to alteration until the next constitutionally established reapportionment period. Consequently, it would follow that judicial action would cease and the judgment of the court below pertaining to equitable relief as well as the manner of holding future elections as therein directed would die of its own terms.

For reasons stated, we withhold further determination of the appeal, except, of course, our jurisdiction to hear the matter further. This will afford the governor an opportunity to call the legislature into special session, and for it to consider the adoption of apportionment acts based upon the 1963 state census in accordance with Article 10, Sections 1 and 2. In the meantime the record will be held for the purpose of such further action as is deemed advisable and within such reasonable time as the circumstances may demand.

# APPENDIX A

## Population of Kansas

as reported by the county assessors to the Kansas
State Board of Agriculture, as of March 1, 1960,
January 1, 1962, and January 1, 1963.

| 1960 | 1962 | 1963 |
|------|------|------|
| Total—2,130,579 | Total—2,165,009 | Total—2,172,296 |

| County | 1960 | 1962 | 1963 |
|--------|------|------|------|
| Stanton | 2,141 | 2,305 | 2,324 |
| Greeley | 2,178 | 2,189 | 2,241 |
| Wallace | 2,214 | 2,296 | 2,336 |
| Wichita | 2,820 | 2,858 | 2,898 |
| Haskell | 3,012 | 3,339 | 3,626 |
| Kearny | 3,064 | 3,108 | 3,227 |
| Hodgeman | 3,116 | 3,172 | 3,185 |
| Lane | 3,148 | 3,223 | 3,271 |
| Hamilton | 3,187 | 3,339 | 3,282 |
| Comanche | 3,288 | 3,246 | 3,096 |
| Morton | 3,317 | 3,783 | 3,838 |
| Clark | 3,491 | 3,556 | 3,567 |
| Chase | 3,978 | 3,988 | 3,978 |
| Logan | 4,158 | 4,322 | 4,343 |
| Gove | 4,304 | 4,498 | 4,367 |
| Stevens | 4,320 | 4,517 | 4,505 |
| Sheridan | 4,395 | 4,339 | 4,299 |
| Gray | 4,408 | 4,598 | 4,651 |
| Kiowa | 4,613 | 4,739 | 4,686 |
| Cheyenne | 4,753 | 4,755 | 4,753 |
| Grant | 5,220 | 5,379 | 5,917 |
| Scott | 5,242 | 5,558 | 5,706 |
| Elk | 5,363 | 5,157 | 5,015 |
| Rawlins | 5,381 | 5,222 | 5,131 |
| Edwards | 5,511 | 5,442 | 5,332 |
| Meade | 5,559 | 5,712 | 5,786 |
| Trego | 5,571 | 5,369 | 5,256 |
| Woodson | 5,584 | 5,426 | 5,316 |
| Graham | 5,674 | 5,492 | 5,458 |
| Ness | 5,696 | 5,677 | 5,652 |

| County | 1960 | 1962 | 1963 |
|---|---|---|---|
| Lincoln | 6,030 | 6,048 | 6,043 |
| Chautauqua | 6,054 | 5,912 | 5,895 |
| Decatur | 6,121 | 6,126 | 6,125 |
| Rush | 6,363 | 6,207 | 6,216 |
| Sherman | 6,725 | 6,805 | 6,802 |
| Wabaunsee | 6,741 | 6,624 | 6,653 |
| Ottawa | 7,006 | 7,257 | 7,029 |
| Thomas | 7,513 | 7,403 | 7,432 |
| Osborne | 7,663 | 7,645 | 7,528 |
| Morris | 7,676 | 7,575 | 7,548 |
| Jewell | 7,719 | 7,395 | 7,395 |
| Stafford | 7,812 | 7,643 | 7,630 |
| Smith | 7,963 | 8,009 | 8,016 |
| Ellsworth | 8,220 | 8,138 | 8,180 |
| Norton | 8,271 | 8,363 | 8,420 |
| Linn | 8,590 | 8,520 | 8,357 |
| Coffey | 8,635 | 8,540 | 8,459 |
| Barber | 8,754 | 8,561 | 8,490 |
| Mitchell | 8,973 | 8,885 | 8,905 |
| Phillips | 9,088 | 9,639 | 9,840 |
| Pawnee | 9,342 | 9,268 | 9,312 |
| Anderson | 9,648 | 9,369 | 9,187 |
| Rooks | 9,840 | 9,598 | 9,279 |
| Harper | 9,879 | 9,806 | 9,638 |
| Republic | 10,083 | 9,772 | 9,712 |
| Doniphan | 10,344 | 10,234 | 10,148 |
| Jackson | 10,381 | 10,302 | 10,356 |
| Kingman | 10,480 | 10,634 | 10,528 |
| Clay | 10,810 | 11,052 | 11,031 |
| Jefferson | 11,261 | 11,234 | 11,001 |
| Washington | 11,345 | 11,012 | 11,056 |
| Greenwood | 11,571 | 11,176 | 11,012 |
| Russell | 11,850 | 11,551 | 11,517 |
| Pratt | 12,079 | 12,149 | 12,025 |
| Pottawatomie | 12,125 | 12,236 | 12,021 |
| Osage | 13,176 | 13,253 | 13,185 |
| Nemaha | 13,431 | 13,214 | 13,225 |
| Rice | 14,041 | 14,021 | 13,688 |
| Wilson | 14,065 | 14,051 | 14,207 |
| Brown | 14,536 | 14,348 | 14,439 |

| County | 1960 | 1962 | 1963 |
|---|---|---|---|
| Cloud | 14,876 | 14,801 | 14,603 |
| Marion | 15,535 | 15,411 | 15,405 |
| Finney | 15,726 | 16,732 | 17,206 |
| Seward | 16,023 | 16,928 | 18,222 |
| Bourbon | 16,405 | 16,300 | 16,367 |
| Marshall | 16,562 | 16,156 | 15,982 |
| Allen | 17,005 | 17,260 | 17,086 |
| Miami | 18,981 | 18,663 | 18,532 |
| Neosho | 19,812 | 19,647 | 19,455 |
| Ford | 20,100 | 20,897 | 21,371 |
| Franklin | 20,412 | 20,629 | 20,560 |
| Atchison | 20,416 | 19,926 | 19,881 |
| Ellis | 20,862 | 21,467 | 21,698 |
| Dickinson | 22,523 | 23,209 | 22,642 |
| Cherokee | 22,714 | 22,447 | 22,089 |
| Geary | 22,886 | 24,539 | 23,814 |
| McPherson | 23,886 | 24,253 | 24,014 |
| Lyon | 24,584 | 25,166 | 25,298 |
| Harvey | 25,775 | 25,556 | 25,803 |
| Sumner | 26,134 | 25,704 | 25,103 |
| Labette | 26,353 | 26,389 | 26,718 |
| Riley | 29,985 | 32,593 | 32,045 |

The following are the thirteen counties which were apportioned more than one representative district pursuant to G. S. 1961 Supp., 4-103, and the number of representative districts is indicated in parentheses.

| Number of representatives | County | 1960 | 1962 | 1963 |
|---|---|---|---|---|
| (2) | Barton | 34,147 | 34,226 | 34,798 |
| (2) | Douglas | 35,414 | 36,602 | 36,904 |
| (2) | Cowley | 37,114 | 36,512 | 36,517 |
| (2) | Leavenworth | 37,338 | 38,590 | 39,131 |
| (2) | Butler | 38,120 | 37,743 | 37,653 |
| (2) | Crawford | 39,074 | 37,091 | 38,084 |
| (2) | Saline | 46,459 | 50,425 | 47,800 |
| (2) | Montgomery | 46,508 | 45,409 | 45,058 |
| (2) | Reno | 59,116 | 59,969 | 60,752 |
| (3) | Shawnee | 134,440 | 143,304 | 144,163 |
| (3) | Johnson | 138,998 | 157,016 | 164,180 |
| (4) | Wyandotte | 193,987 | 193,696 | 196,667 |
| (5) | Sedgwick | 325,399 | 323,574 | 322,113 |

## APPENDIX B

The population of representative districts apportioned to multi-district counties pursuant to G. S. 1961 Supp., 4-103.

| District No. | County | 1961 Population |
|---|---|---|
| 4 | Leavenworth | 23,707 |
| 5 | Leavenworth | 14,214 |
| 6 | Wyandotte | 34,465 |
| 7 | Wyandotte | 41,935 |
| 8 | Wyandotte | 44,240 |
| 9 | Wyandotte | 70,050 |
| 10 | Johnson | 66,420 |
| 11 | Johnson | 29,500 |
| 12 | Johnson | 51,679 |
| 13 | Douglas | 20,021 |
| 14 | Douglas | 16,570 |
| 21 | Crawford | 11,559 |
| 22 | Crawford | 25,532 |
| 25 | Montgomery | 24,643 |
| 26 | Montgomery | 20,766 |
| 32 | Shawnee | 44,513 |
| 33 | Shawnee | 41,155 |
| 34 | Shawnee | 34,552 |
| 47 | Cowley | 19,944 |
| 48 | Cowley | 16,302 |
| 49 | Butler | 21,707 |
| 50 | Butler | 17,036 |
| 60 | Saline | 24,198 |
| 61 | Saline | 23,658 |
| 64 | Sedgwick | 59,004 |
| 65 | Sedgwick | 55,593 |
| 66 | Sedgwick | 69,810 |
| 67 | Sedgwick | 58,901 |
| 68 | Sedgwick | 80,577 |
| 74 | Reno | 50,451 |
| 75 | Reno | 9,518 |
| 77 | Barton | 18,885 |
| 78 | Barton | 15,341 |